**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
John P. Fiske (SBN 249256)
Celeste Evangelisti (SBN 225232)
603 Coast Hwy, Suite G
Solana Beach, California 92075
Telephone:  (214) 521-3605
Fiske@BaronBudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Deborah Dixon (SBN 248965)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone:  (619) 237-3490
DDixon@GomezTrialAttorneys.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM COX, individually, by and through his durable power of attorney, RONALD COX, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMETEK, INC., a Delaware corporation; THOMAS DEENEY, individually; SENIOR OPERATIONS LLC, a limited liability company; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.:  **'17 CV 0597 BAS NLS**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1.  **Negligence**<br>2.  **Gross Negligence**<br>3.  **Private Nuisance**<br>4.  **Public Nuisance**<br>5.  **Trespass**<br><br>**DEMAND FOR A JURY TRIAL** |

Plaintiff, on behalf of himself and all others similarly situated, alleges the following based on information and belief:

## **INTRODUCTION**

1.  On October 6, 2016, the California Department of Toxic Substances Control ("DTSC") issued a Proposition 65 Notification to the San Diego County Public Health Officer, stating:

 a.  "DTSC has obtained information in the course of its official duties pertaining to the property address specified above, indicating that several chemicals have been detected in soil gas and groundwater at 790 Greenfield Drive in the City of El Cajon.  DTSC has conducted soil gas, groundwater and indoor air sampling at properties adjacent to this aerospace manufacturing facility and will be using this information to develop a plan to further assess surrounding properties and mitigate chemical contamination, as necessary.  Several of the chemicals detected are considered human carcinogens and may pose unacceptable short and long term risks to human health and the environment."

 b.  "In September 2016, 29 soil gas samples were collected by an environmental consultant working for the responsible party.  These samples were collected along the adjacent Magnolia Elementary School fence line.  Trichloroethylene (TCE) is a chemical which has been found in the groundwater and soil gas at the property address and surrounding community.  Vapors off-gassing from underlying contaminated groundwater can migrate through the soil and through cracks in the floor and accumulate in the air inside buildings.  The levels of TCE found in soil gas were up to 560 ug/L, which could potentially exceed indoor air levels that pose an unacceptable risk to human health."

 c.  The Proposition 65 Notification lists Ametek, Inc. as the Responsible Party under "RP Name."

d.  The Proposition 65 Notification is attached hereto as Exhibit A.

e.  Plaintiff's mobile home is located on property adjacent to Magnolia Elementary School.

2.  In March 2017, the California Regional Water Quality Control Board (RWQCB) sent letters to eight residents at the Greenfield and Starlight mobile home parks (MHPs).    These MHPs are located immediately adjacent to, and hydrogeologically down-gradient from Magnolia Elementary School and/or the Senior Aerospace facility located at 790 Greenfield Drive.  The letters were sent in response to sampling of air conducted by Ametek, Inc.'s consultant, ERM, within and beneath these eight mobile homes.  The letters indicate the concentrations of trichloroethylene (TCE) in these air samples, and document additional actions to be taken at each mobile home. ERM collected the air samples for Ametek, a party responsible for soil, soil vapor, and groundwater contamination associated with releases at the facility at 790 Greenfield Drive.

a.  TCE was detected in air samples from inside the mobile homes and in the crawl spaces beneath the homes at concentrations up to 13 and 24 micrograms per cubic meter (ug/m3), respectively.   The California Department of Toxic Substances Control (DTSC) screening level for TCE is 0.48 ug/m3.  The air samples taken at the homes exceeded this level in six of the indoor air samples and seven of the crawl space air samples. In fact, some concentrations at these homes exceed the regulatory Accelerated Response Action Level (2 ug/m3) and/or the Urgent Response Action Level (8 ug/m3), established as health and safety thresholds in California. California's Urgent Response Action Level requires "immediate mitigation measures within a few days." Unfortunately, we know now the plume has been there for over 40 years.

b.  The eight letters from the RWQCB are attached hereto as Exhibit B.

c.   Plaintiff's mobile home is located above the same TCE plume, causing the same or substantially similar TCE crawl space and indoor air exposure and human health risk as recorded in the February 2017 samples.

## PARTIES

3.   Plaintiff Adam Cox ("Plaintiff") is the owner of mobile home trailer Unit 111, situated on real property in the Villa Cajon Mobile Home Estate ("Villa Cajon"), a mobile home park located in El Cajon California.  Plaintiff leases the real property upon which Unit 111 is located.  Unit 111 was, until recently, Plaintiff's primary residence.

4.   Plaintiff Adam Cox is a citizen of the State of California and a resident of the County of San Diego.  Ronald Cox brings each and every allegation as attorney in fact, pursuant to a durable power of attorney, for his incompetent brother, Plaintiff Adam Cox.

5.   Plaintiff owns Unit 111, and lived there until December 2016.

6.   Plaintiff started living in Unit 111 in approximately 1986. Prior to that, he lived in Unit 110 with his mother Arla JoDoell Cox, starting in 1976.

7.   Arla Cox owned Unit 110 starting in approximately 1976.  In approximately 1986, Arla Cox sold unit 110 and purchased and moved into Unit 111 with Adam.

8.   Arla Cox, a non-smoker, died from a kidney tumor at the age of 63 in 2002.

9.   Adam Cox, a non-smoker, was diagnosed in December 2016 with a brain tumor at the base of his skull. Adam lived in Unit 111 from 1986 until December 2016, when he moved to a healthcare facility as the result of failing health due to his brain tumor.

10.   Units 110 and 111 are on top of the TCE plume.

11.   Villa Cajon is one of three adjacent mobile home park properties, including Starlight Mobile Home Park ("Starlight") and Greenfield Mobile Home Park

("Greenfield"), which have been contaminated by a toxic groundwater plume emanating from 790 Greenfield Drive. The mobile home parks are not parties to this action.

12.   Defendant Ametek, Inc. is a Delaware corporation with its principal place of business in Pennsylvania.  Defendant Senior Operations, LLC is a Delaware limited liability company with its principal place of business in Illinois.  Defendant Thomas Deeney is a natural person who resides in Pennsylvania.

13.   Defendant AMETEK, INC. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1100 Cassatt Road, Berwyn, Pennsylvania 19312 ("AMETEK").

14.   Defendant SENIOR OPERATIONS LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 300 East Devon Avenue, Bartlett, Illinois 60103.  SENIOR OPERATIONS LLC wholly owns a division named SENIOR AEROSPACE KETEMA, which is located at 790 Greenfield Drive, El Cajon, California 92021 ("SENIOR/KETEMA").

15.   Defendant THOMAS DEENEY is a natural person who resides in Pennsylvania  and who is a corporate officer and employee of Defendant AMETEK, INC.  Defendant THOMAS DEENEY is responsible by act or omission, gross negligence, negligence or otherwise, for the occurrences herein alleged, and  for Plaintiff's resulting harm. At times relevant to this Complaint, Defendant THOMAS DEENEY acted as the agent, servant, and/or employee of AMETEK, and was acting within the course and scope of said agency and employment.

16.   Unless otherwise indicated, the use of any Defendant's name in this Complaint, including "Defendants," includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of the named Defendants.

17.   The true names and capacities of the defendants named herein as Does 1 through 100, inclusive, whether individual, corporate, governmental, associate or otherwise, are unknown to Plaintiff, who therefore sues such Defendants by fictitious

names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Each of the Doe Defendants is responsible in some manner, either by act or omission, strict liability, fraud, negligence or otherwise, for the occurrences herein alleged, and Plaintiff's harm was legally caused by conduct of the Doe Defendants.  Does 1 through 100, inclusive, are responsible to Plaintiff on the facts and theories herein alleged.   At all relevant times, each Defendant, including those fictitiously named, was the agent, servant, and/or employee of each of the remaining Defendants, and was acting within the course and scope of said agency and employment.  Each of the Defendants is in some manner responsible for the events and happenings to which reference is made herein, and each Defendant caused injury and damage to Plaintiff as herein alleged.  The acts of Defendants and each of them were and are the acts of the other Defendants. Defendants, and each of them, ratified, authorized, and/or approved of the acts of the other Defendants.

## JURISDICTION AND VENUE

18.    Diversity Jurisdiction exists under 28 U.S.C. §1332 because all Plaintiffs are residents of and/or own subject trailer units in California, but all Defendants are residents of or have principal places of business in states outside of California.

19.    Venue is proper in this Court in that the subject acts and transactions giving rise to this action occurred in the Southern District of California for the following reasons:

      a. Defendants do or did conduct business in the Southern District of California and have intentionally availed themselves of the laws and markets within Southern District of California by owning and operating, or having owned and operated, the subject aerospace plant which is the source of the subject contamination, at 790 Greenfield Drive in El Cajon, California;

///
///

b. The injury and harm to Plaintiffs, as San Diego County residents, occurred and is still occurring within the Southern District of California in the City of El Cajon.

c. The entire toxic groundwater plume, which is the subject of this lawsuit, is within the Southern District of California.

d. Two "Related" actions are currently filed in the Southern District of California, and this case should be Related to those actions.

e. All property and Plaintiffs, and all putative class members, are located with the Southern District of California.

## FACTUAL ALLEGATIONS

**Companies' History**

20.   In 1953 or 1954, the AMETEK PROPERTY was founded by California Aircraft Products on the current El Cajon, California site, at 790 Greenfield Drive, El Cajon, California 92021. In 1964, California Aircraft Products changed its name to Straza Industries, which was purchased by Defendant AMETEK in 1968.[1]

21.   AMETEK used the AMETEK PROPERTY to manufacture aircraft engine parts from 1968 to 1988.[2]

22.   In late 1987/early 1988, AMETEK learned it created a groundwater plume contaminated with chlorinated solvents, including TCE at 39,000 ug/L, because it dumped and stored toxic waste in a redwood sump, which leached and leaked chlorinated solvents, among other chemicals, into the groundwater and subsurface soil. By late 1987/early 1988, AMETEK knew the contaminated groundwater plume had

---

[1] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-201, dated September 2008.
[2] *Id.*

migrated from its property and into the downgradient groundwater beyond its western property boundary.

23.     In late 1988, AMETEK "spun off" a company called Ketema.  The "spin off" included the property and business at 790 Greenfield Drive, from which the toxic plume was emanating.

24.     Prior to and at the time AMETEK spun off Ketema, AMETEK knew it had contaminated the groundwater with TCE concentrations as high as 39,000 ug/L.

25.     By 1997, Senior Operations, LLC (a.k.a. Senior Flexonics) had purchased the property and business at 790 Greenfield Drive.

26.     Ketema changed its name to Schutte & Koerting, which filed for bankruptcy in 2007.

27.     Currently, the AMETEK PROPERTY is owned by Defendant Senior Operations, LLC, apparently doing business as SENIOR AEROSPACE KETEMA, which has its principal place of business at 790 Greenfield Drive, El Cajon, California 92021 ("KETEMA").[3]

28.     KETEMA is AMETEK spelled backwards.

29.     Despite knowledge of groundwater contamination at extremely high levels, AMETEK made a cold, calculated business decision to simply walk away without any effort to clean up or remediate the groundwater contamination.

**AMETEK Dumped Chlorinated Solvents into a Hole in the Ground**

30.     By 1963, Straza/AMETEK had dug a hole in the ground, which was 12 feet in diameter and 10 feet deep.  This hole was used as a waste "SUMP."[4]

---

[3] SENIOR AEROSPACE KETEMA website, www.saketema.com/history.
[4] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-201, dated September 2008.

CLASS ACTION COMPLAINT

31. Straza/AMETEK lined the walls of the SUMP with redwood planks and poured concrete at its base. AMETEK used this SUMP for toxic waste storage and dumping until 1985.[5]

32. Between 1963 and 1985, for 22 years, Straza/AMETEK dumped up to 7,000 gallons of waste per month into this SUMP. This dumped waste included[6]:

  a.   Spent acid and alkaline solutions

  b.   Industrial chlorinated solvents

  c.   1, 1, 1- Trichloroethane (1, 1, 1- TCA)

  d.   Trichloroethylene (TCE)

  e.   Tetrachloroethylene (PCE)

  f.   Oils

  g.   Paint thinner

  h.   Process Sludge

33. In 1963, Straza/AMETEK submitted a Report of Waste Discharge (ROWD) to the California Regional Water Quality Control Board in order to receive authority and permission to use the SUMP as an impervious storage vessel. AMETEK represented to the Regional Water Quality Control Board that their waste treatment facility would "prevent filtering into native soil" in a February 7, 1963 letter.[7]

34. AMETEK did not reveal the nature or design of the SUMP, excluding the details that the SUMP was lined with redwood planks. It was not until removal of the SUMP, decades later, that the San Diego County Department of Environmental Health discovered and photographed the redwood planks.[8]

35. Highly acidic liquid waste, spent chlorinated solvents, and appreciable amounts of various metallic wastes breached the sump and discharged into soil

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

surrounding the sump and into the groundwater, as AMETEK dumped the chlorinated solvent waste into the SUMP until 1985.[9]

36.    Between 1963 and at least 1985, the strong, acidic liquid waste deteriorated the SUMP allowing the chlorinated solvent waste to seep and percolate into the surrounding soil, fractures in the granite rock, and into the groundwater.[10]

37.    In 1987, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 810,000 parts per billion (ppb).[11]

38.    In 2007, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 48,000 parts per billion (ppb).[12]

39.    The 1987 and 2007 concentration levels exceed state water quality objectives by unthinkable magnitudes.  A chart from the Regional Water Board's 2008 Administrative Liability Complaint illustrates the excessive pollution caused by AMETEK:[13]

## Table 1

| Waste Constituent | Ground-Water Concentration [a] (ug/l) | Basin Plan Water Quality Objective (ug/l) |
|---|---|---|
| Tetrachloroethylene (PCE) | 5,400 | 5 |
| Trichloroethylene (TCE) | 40,000 | 5 |
| 1,1-Dichloroethylene (1,1-DCE) | 1,300 | 6 |
| 1,1,1 – Trichloroethane (1,1,1-TCA) | 270 | 200 |
| 1,4 - Dioxane | 800 | 3* |

\* California Department of Public Health advisory Notification Level (NL).
[a] Data from the December 2007 Groundwater Monitoring Report.

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

**One of the Largest TCE Plumes in the State of California**

40.   AMETEK'S waste discharge caused one of the largest TCE/chlorinated solvent plumes in the State of California.[14]

41.   The chlorinated solvent plumes are massive, possibly extending 1.3 miles westward and down-gradient.   The plumes include the following chemicals and dimensions[15]:

        a.   TCE: 7,000 feet by 1,600 feet, migrated beneath 257 acres of land

        b.   DCE: 3,200 feet by 1,200 feet, migrated beneath 88 acres of land

        c.   Dioxane: 5,600 by 1,000 feet, extends across 128 acres of land

        d.   TCA: 1,200 feet by 400 feet, extends beneath 11 acres

42.   Additionally, plumes of PCE, 1,1-DCA, benzene, toluene, ethylbenzene, and xylene exist in the groundwater.[16]

43.   According to AMETEK'S consultants, ERM, the plume has contaminated the groundwater and soil beneath Magnolia Elementary School, GREENFIELD, STARLIGHT, VILLA CAJON, and other neighboring properties.

**AMETEK'S Water Quality Violations**

44.   The California Regional Water Quality Control Board filed the 2008 Administrative Liability Complaint against Defendant AMETEK, INC. for failing to comply with the previous 2002 Cleanup and Abatement Order No. R9-2002-201.[17] AMETEK, INC. committed the following violations[18]:

        a.   Failure to Report as Required by Directive No. 1: "Ametek failed to install and collect ground-water samples in accordance with Directive

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

1   1.e and failed to submit a complete Delineation Report by April 30,

2   2003….. the total number of days of violation is 1,974 days."

3       b.  Failure to Submit a Complete Feasibility Study Report as Required by

4       Directive No. 3: "Ametek failed to submit a complete Feasibility Study

5       Report by January 16, 2004….. the total number of days of violation is

6       1,713 days."

7   45.   The California Regional Water Quality Control Board then imposed a fine

8   of $2,269,000 for the above mentioned violations[19]:

9       a.  "$1,671,500 in liability for Failure to Report as Required by Directive

10      No. 1…."

11      b.  "$597,500 in liability for Failure to Submit a Complete Feasibility Study

12      Report as Required by Directive No. 3…."

13  **Ametek and Tom Deeney Knowingly, Willfully, and Intentionally Failed to**

14  **Cleanup and Abate the Contamination**

15  46.   AMETEK and DEENEY knowingly, willfully, and intentionally failed to

16  establish monitoring wells, which were intended to identify the boundaries of and

17  delineate the massive plume.   In the 2008 Administrative Liability Complaint, the

18  California Water Board documented AMETEK'S willful, knowing, and intentional

19  failures[20]:

20      a.  "After 20 years of investigation efforts, Ametek and S&K have not

21      installed a sufficient monitoring well network to delineate the vertical

22      and horizontal extent of the waste plume and have not taken any efforts

23      to cleanup and abate the effects of their discharge."

24  ///

25

26  _____

    [19] *Id.*

27  [20] Technical Analysis for Administrative Liability Complaint No. R9-2008-0033,

28  September 2008.

b. "Ametek and S&K are responsible for delineating and remediating the discharge of wastes."

c. "Ametek and S&K were repeatedly advised that their submittals regarding plume delineation were incomplete or deficient, yet they failed to conduct additional work to address the deficiencies."

d. "Ametek and S&K's failure to completely delineate the plume has allowed significant concentrations of contaminants to remain in place as a continued source of pollution."

e. "Ametek and S&K failed to act appropriately, not only in their efforts to complete the delineation of the plume, but in their responsibilities to implement appropriate cleanup and abatement measures in a reasonable amount of time."

f. "Such failures have caused a condition of pollution and contamination in the ground water beneath the El Cajon Valley with continuing impacts to the existing beneficial uses of the Santee/El Monte Basin."

47. AMETEK was named a "Responsible Party" in Cleanup and Abatement Order 98-11 in 1998 by the California Regional Water Quality Control Board ("CRWQCB"). AMETEK was required, among other things, to fully delineate the plume, submit a Feasibility Study, submit a Remedial Action Plan, and otherwise fully comply with CAO 98-11.

48. AMETEK and DEENEY choose to not comply with CAO 98-11.

49. The CRWQCB sent many, many letters and Notices of Violation ("NOVs") to AMETEK and DEENEY regarding the lack of compliance with CAO 98-11. AMETEK and DEENEY simply ignored the CRWQCB letters and NOVs, allowing the plume to continue to contaminate properties, including causing vapor intrusion into the mobile homes such as the one owned by Plaintiff Adam Cox.

50. The CRWQCB again named AMETEK in Cleanup and Abatement Order R9-2002-201. Again, AMETEK and DEENEY choose to not comply. Again, the

CRWQCB sent many, many letters and NOVs.  And, again, AMETEK and DEENEY simply ignored the CRWQCB, further allowing the plume to continue to contaminate properties, including Plaintiff Adam Cox's home.

**Magnolia Elementary School- An Adjacent Property**

51.     On June 1, 2015, the Board of Governors of the Cajon Valley Union School District voted unanimously to close Magnolia Elementary School, another property located adjacent to the three mobile home parks, for the 2015-2016 school year because the indoor air was contaminated with toxic chemicals.  These chemicals, which Defendants improperly dumped on their adjacent property over many years, contaminate the groundwater and soil under the school and the adjacent mobile home parks, including the groundwater and soil located on the real property where Plaintiff's trailer is situated.

52.     To mitigate the intrusion of TCE vapors into indoor air at Magnolia Elementary School, Cajon Valley Union School District installed sub-slab depressurization systems, designed to remove toxic vapors from underneath classroom buildings.

53.     In 2008, the Department of Toxic Substances Control (DTSC) entered into a Consent Order with AMETEK, documenting the following[21]:

      a.  "In June 2007, samples taken from ground water monitoring wells showed concentration of TCE of up to 50,000 micrograms per liter beneath the former Ketema facility, and up to 3,600 micrograms per liter beneath the Site."[22]

/// 

///

---

[21] Consent Order, Department of Toxic Substances Control, California Environmental Protection Agency, Docket No. HAS-CO 07/08-198, 2008.

[22] "Site" means Magnolia Elementary School.

b. "The corresponding modeled indoor air exposure at this level corresponds to a lifetime cancer risk in excess of one-in-ten-thousand ($10^{-4}$) at the Site.  The TCE groundwater plume is impacting the Site."

c. "Soil gas and indoor air quality sampling conducted between July 2004 and August 2005 at the Site showed TCE concentrations in the subsurface at up to 130 parts per billion by volume and inside the classrooms at levels up to 1.6 micrograms per cubic meter, as reported in "Results of Soil Vapor and Air Testing" dated May 27, 2005, and the "Results of Indoor Air Sampling" dated August 26, 2005."

d. "Exposure at this level corresponds to a lifetime cancer risk in excess of one-in-a-million ($10^{-6}$)."

54.   In 2008, the DTSC identified the "Health Effects" of the chlorinated solvents and chemicals AMETEK had dumped into its SUMP[23]:

a. "Volatile Organic Compounds (VOCs) detected at the former Ketema facility and the Site include: 1) benzene, 2) chlorinated solvents, such as TCE, PCE, and 1,1 DCE."

b. "Exposure to such chemicals may occur by inhalation of vapors coming from soil and groundwater, as well as ingestion of, and dermal contact with, VOCs in soil or water."

c. "Potential health effects include cancer, liver and kidney damage, respiratory impairment and central nervous system effects."

55.   In 2008, the DTSC identified the "Routes of Exposure" of those chlorinated solvents and chemicals[24]:

a. "Certain activities conducted at the former Ketema facility have contaminated soil and groundwater.  Because the contaminants found on

---

[23] *Id.*
[24] *Id.*

the former Ketema facility and under the Site include VOCs, an assessment of all exposure routes will be conducted."

b. "The potential routes of exposure include inhalation, ingestion, and dermal contact."

56. In 2008, the DTSC also identified the "Public Health and/or Environmental Risks"[25]:

a. "Contaminants have been found in the soil and groundwater at the former Ketema facility and the Site. Risks from these contaminants may be caused by exposure to soil vapor, soils and/or groundwater, through ingestion, inhalation of dusts, and/or vapors, and dermal contact."

b. "The groundwater is relatively shallow at the Site and indoor from groundwater via soil vapor was confirmed at the Site."

57. Since 2012, the DTSC has recommended quarterly monitoring of indoor air quality in classrooms and quarterly monitoring of soil gas at Magnolia Elementary School, located adjacent to Greenfield, Starlight and Villa Cajon, the real property upon which Plaintiff's mobile home is situated.[26]

58. In November 2014, the DTSC evaluated indoor air quality test results:[27]

a. "Detection of TCE within one room (Room 8) exceeded the accelerated response action level for residential exposure scenarios (2 ug/m3)...."

b. "PCE was detected in indoor air within several rooms, with one detection in Room 19 (3.1 ug/m3) exceeding DTSC's modified air screening level for industrial exposure scenarios (2.08 ug/m3) and two detections (Rooms 11

---

[25] *Id.*

[26] Letter to Mr. James Beard, Cajon Valley School District, from Shahir Haddad, P.E., Supervising Engineer, Department of Toxic Substances Control, November 17, 2014.

[27] *Id*, attached Memorandum, SOIL VAPOR SURVEY AND INDOOR AIR QUALITY ASSESSMENT, From Patrick Kerzic, PhD, DABT, Staff Toxicologist, November 3, 2014.

and 19) exceeding DTSC's modified air screening level for residential exposure."

    c.  "Analysis of several indoor air contaminants (PCE, TCE, 1,1-DCE, 1,1,1-TCA, and 1,1-DCA) which likely appear in indoor air due to vapor intrusion and are found in nearby soil vapor wells, using a Schools Risk Screening Model (Schoolscreen, developed by the Office of Environmental Health Hazard Assessment (OEHHA)) indicates that both cancer risks and health hazards to on site staff and students may approach or exceed DTSC's points of departure for cancer risk (1 in one million excess risk) and hazards (hazard index of 1.0)."

59.    In November 2014, the DTSC made conclusions and recommendations: [28]

    a.  "Recent sampling of indoor and ambient air is consistent with vapor intrusion from contaminants in the subsurface into classrooms at Magnolia Elementary School."

    b.  "Precautionary actions should be taken to increase ventilation in all classrooms."

    c.  "In order to confirm detections of contaminants within indoor air, an additional round of air sampling should be performed as soon as possible."

    d.  "HERO (Human and Ecological Risk Office) supports the recommendation of a human health risk assessment for staff and students at Magnolia Elementary School."

**Magnolia- The December 2014 Vapor Intrusion Air Quality Test Results**

60.    After November 2014, in December 2014, indoor air quality was tested, and the results showed a spike in indoor air vapor intrusion.

61.    On May 7, 2015, the DTSC held a Community Update Meeting for Magnolia Elementary School, at which several teachers and parents of Magnolia

---

[28] *Id.*

students attended.   The DTSC interpreted results from the December 2014 vapor intrusion test results.

62.   As part of the meeting, the DTSC gave a presentation, including the following slides and information[29]:

63.



64.

---

[29] Presentation at Community Update Meeting for Magnolia Elementary School, Schools Evaluation and Brownfields Outreach, California Department of Toxic Substances Control, May 7, 2015.

65.

## Previous Sampling Events and Results

| | Cancer Risk | Additional Risk in One Million |
|---|---|---|
| August 2014 | $4.5 \times 10^{-6}$ | 4.5 |
| December 2014 | $4.2 \times 10^{-5}$ | 42 |
| March 2015 | $5.6 \times 10^{-6}$ | 5.6 |



Department of Toxic Substances Control

66.

# DTSC's Risk Management Range



Highest cancer risk estimated Dec 2014: $4.2 \times 10^{-5}$

Highest cancer risk estimated March 2015: $5.6 \times 10^{-6}$

Source: DTSC Vapor Intrusion Public Participation Advisory

Department of Toxic Substances Control

67.    The cancer risk for the December 2014 and the March 2015 levels are above the "ACCEPTABLE" range and entering the red zone.  The cancer risk for the December 2014 levels are in the red.

68.    The cancer risk appears to reach levels 42 times the threshold level which guides the DTSC to take action.

69.    The groundwater and air contamination includes chemicals such as TCE (Trichloroethylene), PCE (Tetrachloroethylene), and other chlorinated solvents.   These chemicals are known to cause cancer and other serious health effects in humans.

70.    Defendants' active dumping and continued contamination is wanton, reckless, and rife with cold corporate cost calculations, warranting punitive and exemplary damages.

71.    In continuing to improperly dump chemicals and failing to clean up, Defendants made calculated business decisions and actively avoided compliance with regulatory orders to identify the size and scope of the contamination.

72.    Based on current data from Defendant AMETEK's own consultants, it appears an active source of "free product" continues to contaminate the groundwater and soil underneath the mobile home parks, including the real property upon which Plaintiff's trailer is situated, and will do so for decades if not centuries if nothing is done to address the situation.

**Vapor Intrusion at the Mobile Home Parks**

73.    Despite the plume's existence for over 40 years, and despite the existence of a Cleanup and Abatement Order since 1998, the first indoor air and crawl space vapor sampling did not take place until February 2017, after two related lawsuits were filed.

74.    The CRWQCB required AMETEK, as the Responsible Party, to sample the air and crawl space of mobile homes at Greenfield and Starlight MHPs. The positive results from that air sampling became known to Plaintiff in March 2017. This was the first time the mobile homes were tested for vapor intrusion.

///

75.     The results of the mobile home sampling revealed TCE vapor intrusion into the indoor air and crawl space at levels up to 13 ug/m3 and 24 ug/m3, respectively. These results, in addition to other results, exceed the California residential screening level of .48 ug/m$^3$, and/or the Accelerated Response Action Level of 2 ug/m$^3$, and/or the Urgent Response Action Level of 6 ug/m$^3$.

76.     Thus, TCE vapor intrusion is documented in the indoor air and crawl space of mobile homes at the mobile home parks.  Plaintiff's Unit 111 (and his previous Unit 110), are situated on the groundwater contaminated plume causing this indoor air intrusion.

**Defendants' Conscious Choice to Ignore the Continuous Contamination**

77.     Based on information and belief, and according to review of current and historical technical and legal documents, it appears 790 Greenfield Drive is still contaminated with toxic chemicals that provide a continual source of groundwater and soil contamination.

78.     As groundwater passes from east to west, from 790 Greenfield Drive, underneath the school and adjacent MHPs, the passing groundwater is contaminated by TCE and other chlorinated solvents. The contaminated groundwater continues to pollute the soil and groundwater beneath Greenfield, Starlight, and Villa Cajon, including the real property upon which Plaintiff's trailer is situated.

79.     New groundwater contamination occurs on a daily basis, and contaminated groundwater newly enters into and beneath the real property upon which Plaintiff's mobile home trailer is located on a daily, continuing basis.

80.     SENIOR OPERATIONS knows and has known, since purchasing 790 Greenfield Drive 20 years ago, that groundwater is continuously contaminated by toxic chemicals underneath and on 790 Greenfield Drive, thereby continuously trespassing and causing a known and continuous nuisance.

///

///

81.     SENIOR's alleged status under any Prospective Purchaser Agreement with the CRWQCB has no effect or impact as to third party tort victims such as Plaintiff or the putative class.

82.     SENIOR does not have a Prospective Purchaser Agreement with the Department of Toxic Substances Control.

83.     THOMAS DEENEY, acting within the course and scope of his employment with AMETEK, responsible for decision making and capable of binding AMETEK, between at least 1998 and 2008, did personally and consciously ignore official State of California Cleanup and Abatement Orders, official State of California Notices of Violation, and many letters from the State of California regarding failure to delineate the toxic groundwater plume as a step towards remediation, thereby consciously allowing the plume to continue to grow, thereby causing additional harm.

84.     Despite receiving such Cleanup and Abatement Orders, Notices of Violation and letters regarding AMETEK's failure to delineate the plume, DEENEY consciously ignored such correspondence, with knowledge of legal violations and knowledge of a toxic plume, thereby causing additional harm.

85.     Despite such knowledge, all Defendants have consciously ignored the continuous release and contamination of groundwater and vapor intrusion. Such willful disregard warrants punitive and exemplary damages.

**Toxic Health Effects**

86.     The Agency for Toxic Disease Registry and U.S. Environmental Protection Agency provide information for some of these toxins[30]:

> c.  TCE: *Affected Organ Systems*: Developmental (effects during periods when organs are developing), Neurological (Nervous System); *Cancer Classification*: NTP: Reasonably Anticipated to be a Human Carcinogen; EPA: Carcinogenic to humans; IARC: Carcinogenic to

---

[30] www.atsdr.cdc.gov

humans (evidence for cancer is based on kidney cancer, limited evidence for non-Hodgkin lymphoma and liver cancer, as well as, various tumors in animals); *Chemical Classification*: Volatile organic compounds; *Summary:* Trichloroethylene (TCE) is a nonflammable, colorless liquid with a somewhat sweet odor and a sweet, burning taste. It is used mainly as a solvent to remove grease from metal parts, but it is also an ingredient in adhesives, paint removers, typewriter correction fluids, and spot removers. Trichloroethylene is not thought to occur naturally in the environment. However, it has been found in underground water sources and many surface waters as a result of the manufacture, use, and disposal of the chemical.

d.  PCE: *Affected Organ Systems:* Developmental (effects during periods when organs are developing), Neurological (Nervous System), Respiratory (From the Nose to the Lungs); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Tetrachloroethylene (PCE) is a manufactured chemical that is widely used for dry cleaning of fabrics and for metal-degreasing. It is also used to make other chemicals and is used in some consumer products.

e.  TCA: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Neurological (Nervous System); *Chemical Classification:* Volatile organic compounds; *Summary:* 1,1,1-Trichloroethane is a synthetic chemical that does not occur naturally in the environment. It also is known as methylchloroform, methyltrichloromethane, trichloromethylmethane, and trichloromethane.

///

///

f. DCE[31]: *Affected Organ Systems:* Short-term: EPA has found 1,1-DCE to potentially cause the following health effects when people are exposed to it at levels above the MCL for relatively short periods of time: liver damage. Long-term: 1,1-DCE has the potential to cause the following effects from a lifetime exposure at levels above the MCL: liver and kidney damage, as well as toxicity to the developing fetus; cancer; *Summary:* 1,1-DCE will evaporate from soil and will leach into the groundwater where its fate is unknown, but degradation is expected to be slow. Its tendency to accumulate in aquatic life is unknown but expected to be minor.

g. Dioxane: *Affected Organ Systems:* Hepatic (Liver), Ocular (Eyes), Renal (Urinary System or Kidneys); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Summary:* 1,4-Dioxane is a clear liquid that easily dissolves in water. It is used primarily as a solvent in the manufacture of chemicals and as a laboratory reagent; 1,4-dioxane also has various other uses that take advantage of its solvent properties.

h. Vinyl Chloride: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Developmental (effects during periods when organs are developing), Hepatic (Liver), Immunological (Immune System); *Cancer Classification:* NTP: Known to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Vinyl chloride is a colorless gas. It burns easily and it is not stable at high temperatures. It has a mild, sweet odor. It is a manufactured substance that does not occur naturally. It can be formed when other substances such as Trichloroethane (TCA), trichloroethylene (TCE), and

---

[31] www.epa.gov

tetrachloroethylene (PCE) are broken down.  Vinyl chloride is used to make polyvinyl chloride (PVC).  PVC is used to make a variety of plastic products, including pipes, wire and cable coatings, and packaging materials.  Vinyl chloride is also known as chloroethene, chloroethylene, and ethylene monochloride.

**Greenfield, Starlight, and Villa Cajon Mobile Home Parks**

87.   Greenfield is a mobile home park located due west of the AMETEK PROPERTY.  As such, Greenfield is directly west and down-gradient of the AMETEK SUMP.

88.   Starlight is a mobile home park located due west-northwest of the AMETEK PROPERTY.   As such, Starlight is northwest and down-gradient of the AMETEK SUMP.

89.   Villa Cajon is a mobile home park located due west-northwest of the AMETEK PROPERTY.  As such Villa Cajon is west-northwest and down-gradient of the AMETEK SUMP.

90.   According to AMETEK's own environmental consultants, Environmental Resources Management ("ERM"), the chlorinated solvent plume, including TCE and other chemicals, flows directly underneath Greenfield, Starlight, and Villa Cajon.

91.   Groundwater Monitoring Wells (MW) have been placed around the mobile home parks: upgradient, downgradient, north, and south of the mobile homes.   TCE concentrations sampled from these groundwater MWs assist in identifying the TCE plume underneath the mobile home parks.  Below are examples of TCE concentrations surrounding the mobile home parks:

a. MW-40 in 2016, upgradient of MHPs and adjacent to Starlight: 81,000 ug/L.

b. MW-16 in 2011, upgradient of and adjacent to MHPs: 5,600 ug/L.

c. MW-18 in 2012, downgradient of MHPs: 1,200 ug/L.

d. MW-46B in 2015, upgradient of and adjacent to MHPs: 9,500 ug/L.

e. MW-46C in 2013, upgradient of and adjacent to MHPs: 11,000 ug/L.

CLASS ACTION COMPLAINT

92.   AMETEK's consultants document groundwater contamination of TCE and other chemicals underneath Greenfield, Starlight, and Villa Cajon.

93.   TCE and other chlorinated solvent chemicals at and underneath 790 Greenfield Drive continue to cause groundwater contamination on a daily basis—the contaminated groundwater flows down-gradient and westward into and beneath Greenfield, Starlight, and Villa Cajon.

94.   A continuous groundwater contamination is occurring every day due to a currently constant source of chemicals underneath 790 Greenfield Drive.  The current constant source of chemicals underneath 790 Greenfield Drive continuously contaminates the groundwater as it passes westward underneath 790 Greenfield Drive property and into and beneath the real property upon which Plaintiff's residence is located, causing vapor intrusion into Plaintiff's mobile home crawl space and indoor air.

95.   Defendants know and have known that 790 Greenfield Drive, including the subsurface soil, alluvium, decomposed granite, and/or granitic bedrock, are contaminated with TCE and other toxic chemicals.  Defendants know and have known that TCE and other toxic chemicals on and beneath 790 Greenfield Drive have been and continue to contaminate the groundwater as it passes through the property's subsurface soils on underneath the subject mobile home park properties, and despite this knowledge, Defendants have consciously ignored the risk of further contamination and the risk to human health and have chosen not to clean up or remediate the TCE and other toxic chemicals.

**Additional/Special Increased Risk to Children and Pregnant Women**

96.   Young children 10 years and younger, and pregnant women and their unborn babies, are especially susceptible and vulnerable to toxic exposure and associated risk thresholds are higher for children and pregnant women.

   a.   The U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, published *ATSDR Case Studies in Environmental Medicine, Principles of Pediatric Environmental Health-*

*The Child as Susceptible Host: A Developmental Approach to Pediatric Environmental Medicine, Course: WB2089*, which explains:

1. "Childhood is a time of rapid growth and development. It is accompanied by changes in organ system functioning, metabolic capabilities, physical size, and behavior that can dramatically modify the effects, the illness, or both caused by toxicant exposure. Pediatricians and other clinicians caring for children need to understand these special susceptibilities."

2. "Children may ingest or inhale dirt or dust contaminated with… environmental toxicants during play or other normal activities. Questions could include exposures to indoor air and outdoor air pollutants and contaminated drinking water and soil."

3. "Soil intake ranged from a minimal estimate of 108 milligrams (mg)/day to a maximum of 1,834 mg/day of soil…."

4. "Children usually have increased exposures per kilogram of body weight, compared to adults."

5. "Children's dynamic growth and development puts them at increased risk from environmental toxicants."

6. "Special consideration must be given to toxic exposures during fetal life, infancy, childhood, and adolescence."

7. "Because children grow and develop, they have a higher metabolic rate and thus have a greater need for oxygen….. Children breathe more air… per kilogram of body weight than do adults. These result in greater exposures per kilogram of body weight to any contaminants in the air…."

8. "Children have an increased surface area-to-body mass ratio (in infants and young children) resulting in an increased risk of

dermal exposure and absorption."

9. "Children's long life expectancy increases their risk of adverse outcomes (e.g., cancer, renal or liver failure, senility) from exposures to those toxicants whose effects are expressed after a long latency period."

10. "The rapid development of organ systems during embryonic, fetal, infant, and early childhood periods make children vulnerable when exposed to environmental toxicants."

11. "Parental exposures before a child is conceived can result in adverse reproductive effects, including Infertility, Spontaneous abortion, and Genetic damage to the fetus, possibly resulting in birth defects."

12. "Exposures to hazardous substances during pregnancy can potentially affect the development of fetal organ systems."

13. "Exposures can cause profound systemic damage out of proportion with the dose response seen in adults."

14. "A fact of fetal life is that the fetus cannot escape transplacental transport of toxicants to which the mother is exposed."

## CACI 3903 B- Medical Monitoring- Toxic Exposure (Economic Damages)

97.   As a result of the above mentioned toxic exposure, the need for future medical monitoring is reasonably certain, and Plaintiff, on behalf of himself and the entire putative class, seek reasonable monitoring.

98.   The significance and extent of the class' exposure to the chemicals is extensive because residents were exposed for many hours per day and night, and for many years while living in the mobile homes exposed to toxic vapor intrusion.

99.    As described above, and documented by the ASTDR and the EPA, the subject chemicals are very toxic and can cause cancer, and/or liver, kidney, respiratory, neurological, developmental, and other diseases and illnesses.

100.    Due to the indoor air intrusion of these toxic chemicals, there is a significantly increased risk to the class members of developing the above mentioned diseases as a result of the exposure when compared to their chances of developing those diseases had they not been exposed and when compared to the chances that members of the public at large will develop the diseases.

101.    The seriousness of the diseases can be as grave as cancer and organ disease, and can be extremely painful and/or deadly.

102.    The class will receive a significant medical benefit from early detection and diagnosis because early detection of cancer and organ disease can help doctors treat class members and hopefully prevent grave or very serious outcomes, such as late stage cancers, organ failure, and potentially death.

## First Cause of Action

### Negligence

### (Against All Defendants)

103.    Plaintiff realleges and incorporates by reference as though fully set forth herein the preceding paragraphs 1 through 102.

104.    Plaintiff was and continues to be harmed by Defendants' negligent conduct as described above.

105.    Plaintiff was and continues to be harmed by Defendants' negligent conduct because he has been exposed to toxic vapors and his mobile home is subject to vapor intrusion, causing economic losses.

106.    Defendants' negligent conduct was a substantial factor in causing Plaintiffs' harm.

107.    Defendants' above-described conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

### Second Cause of Action

### Gross Negligence

### (Against All Defendants)

108.   Plaintiff realleges and incorporates by reference as though fully set forth herein the preceding paragraphs 1 through 107.

109.   Plaintiff was harmed by Defendants' negligent conduct as described above.

110.   Plaintiff was and continues to be harmed by Defendants' negligent conduct because he has been exposed to toxic vapors and his mobile home continues to be subjected to vapor exposure, causing economic damages.

111.   Defendants' negligent conduct was a substantial factor in causing Plaintiffs' harm.

112.   Defendants' negligent conduct lacked any care whatsoever and was an extreme departure from what reasonably careful companies would do.

113.   Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

### Third Cause of Action

### Public Nuisance

### (Against All Defendants)

114.   Plaintiff realleges and incorporates by reference as though fully set forth herein the preceding paragraphs 1 through 113.

115.   Plaintiff suffered harm because Defendants created a nuisance, which is a continuing nuisance.

116.   Defendants, by acting and failing to act, created and/or failed to prevent the toxic chemical contamination, a condition that was and is harmful to health, and indecent and offensive to the senses, and an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life.

117.   The toxic chemical contamination and exposure has affected a substantial number of people at the same time.

118.   An ordinary person would be reasonably annoyed or disturbed by the toxic chemical contamination and exposure.

119.   The seriousness of the harm outweighs the social utility of Defendants' conduct.

120.   The Plaintiff did not consent to Defendants' conduct.

121.   Plaintiff suffered and continues to suffer harm different from the type of harm suffered by the general public because he was exposed to toxic vapors and his mobile home is exposed to toxic vapors.

122.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

123.   Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## Fourth Cause of Action

### Private Nuisance

### (Against All Defendants)

124.   Plaintiff realleges and incorporates by reference as though fully set forth herein the preceding paragraphs 1 through 123.

125.   Defendants interfered with Plaintiff's use and enjoyment of his mobile home property.

126.   Plaintiffs owns Unit 111 and leases land at Villa Cajon.

127.   Defendants, by acting and/or failing to act, created and/or failed to prevent toxic chemical contamination, a condition a condition that is harmful to health, indecent and/or offensive to the senses, and is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and/or property.

128.   This toxic chemical contamination is a condition that interfered with Plaintiff's use and enjoyment of his property.

129.   The above-described nuisance is a continuing nuisance.

130.   Plaintiff did not consent to Defendants' conduct.

///

131.   An ordinary person would be reasonably annoyed or disturbed by Defendants' conduct.

132.   Plaintiff is and continues to be harmed because he has been exposed to toxic vapors and his mobile home is exposed to toxic vapors, causing economic loss.

133.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

134.   The seriousness of the harm outweighs the public benefit of Defendants' conduct.

135.   Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

**Fifth Cause of Action**

**Trespass**

**(Against All Defendants)**

136.   Plaintiff realleges and incorporates by reference as though fully set forth herein the preceding paragraphs 1 through 135.

137.   Defendants trespassed on Plaintiffs' property.

138.   Plaintiff owns a mobile home trailer at Villa Cajon, situated above the toxic plume and exposed to toxic vapors.

139.   Defendants intentionally, recklessly, and negligently entered Plaintiff's property by intentionally, recklessly, and negligently causing and/or allowing toxic vapors to enter the crawl space and indoor air of Plaintiff's mobile home.

140.   Plaintiff did not give permission for the entry.

141.   The trespass is a continuing trespass.

142.   Plaintiff was and continues to be harmed because his mobile home is and has been exposed to toxic vapors causing economic loss, and Plaintiff has been exposed to toxic vapors.

143.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

144.   Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## DELAYED DISCOVERY AND EQUITABLE TOLLING

145.   At all times relevant herein, Defendants concealed relevant facts that would have allowed Plaintiff to discover the true nature and degree of the waste dumping, groundwater contamination, soil contamination, and vapor intrusion. As a result of these concealments and misrepresentations, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiff.   Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiff with respect to the true nature, quality, and hazards of use of the waste dumping, groundwater contamination, and vapor intrusion as described herein and above.

146.   Plaintiff exercised due diligence to discover Defendants' wrongdoing. However, such wrongdoing and/or the full extent and degree of such wrongdoing was not reasonably discoverable prior to the date of the filing of this action and/or prior to two years prior to the filing of this action since Defendants concealed their wrongdoing through misrepresentation, concealment, and failure to disclose.   Plaintiff exercised due diligence by promptly filing this Complaint after discovering the facts giving rise to these claims.

147.   Plaintiff did not discover toxic vapor intrusion until very recently, in March 2017, and certainly within the past two years, only after the California Regional Water Quality Control Board released results of indoor air and crawl space vapor testing, which occurred in February 2017.

## CLASS ACTION ALLEGATIONS

148.   Plaintiff and the members of the Class have all suffered injury in fact as a result of the exposure to harmful toxins to their person and their property, which was the result of Defendants' unlawful, intentional, and grossly negligent conduct.

149.   The "Class Period" includes from 1963 to the date of the filing of this action.

///

150.    Plaintiff brings this lawsuit on behalf of himself and all others who resided in or owned a mobile home at Greenfield, Starlight, and/or Villa Cajon, who are similarly situated under Rule 23. Subject to additional information obtained through further investigation and/or discovery, the proposed "Class" consists of the following:

"All persons who have resided or do now reside, and/or all persons who have owned or do now own a mobile home, situated above the contaminated groundwater plume, at Greenfield, Villa Cajon, and/or Starlight mobile home parks."

Excluded from the putative class are Defendants and their officers, directors, and employees. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

151.    **Ascertainability.** The members of the Class are readily ascertainable by resort to mobile home park records, as well as through public notice.

152.    **Numerosity.** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains thousands of members.

153.    **Existence and predominance of Common Questions of Law and Fact.** Common questions of law and fact that exist as to all members of the Class predominate over any questions affecting only individual class members. All members of the Class have been subject to the same conduct and exposure. The common legal and factual questions include, but are not limited to, the following:

a.    Whether Defendants dumped toxic waste into a SUMP;

b.    Whether toxic waste escaped the SUMP and percolated into the groundwater beneath the subject properties;

c.    Whether the subject toxic waste caused vapor intrusion into mobile homes;

d.    Whether residents were exposed to toxic vapors while residing at the subject mobile homes;

e.    Whether the contamination is continuing;

f.    Whether Defendants' conduct was negligent and/or grossly negligent;

g.    Whether Defendants' conduct was intentional;

h.    Whether Defendants should be liable for medical monitoring costs;

i.    Whether Defendants should be liable for compensatory damages.

154.   **Typicality.**   Plaintiff's claims are typical of the claims of the members of the Class in that Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff, like members of the proposed Class, was exposed to toxic vapor intrusion as a resident and owns his mobile home.  Defendants have no defenses unique to Plaintiff.

155.   **Adequacy of Representation.**   Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in environmental, mass, and class actions.   Plaintiff has no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiff and proposed Class.

156.   **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.   Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.   Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action.  The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants.  The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them.  Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court

system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Therefore, a class action is maintainable under Civil Code section 382.

157.  Unless a class is certified, Defendants will escape liability for decades-long exposure of toxic chemicals to innocent residents and property owners.  Unless class-wide damages and/or a medical monitoring program is ordered as compensation and as a deterrent, Plaintiff and class members cannot be rightly compensated for the harms caused by the vapor intrusion.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants, and each of them, and that Plaintiffs be awarded relief and damages under all causes of action, from Defendants, and each of them, as follows:

a.  Certify the Class as requested herein;

b.  Under all Causes of Action as allowable by law, compensatory damages;

c.  Under all Causes of Action as allowable by law, costs to abate and/or mitigate the continuing nuisance;

d.  Under all Causes of Action as allowable by law, medical monitoring damages.

e.  Under all Causes of Action as allowable by law, damages based on diminution of value of property;

f.  Punitive damages;

g.  Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and as applicable, to prevent Defendants from retaining the benefits of their wrongful conduct;

h.  Statutory post-judgment interest allowable by law;

i.  Costs of this suit allowable by law;

j.   Reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, as allowed by law; and,

k.   Awarding any and all other relief that this Court deems necessary or appropriate.

DATED: March 24, 2017            Respectfully Submitted,


By:  s/ John P. Fiske
         John P. Fiske

**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
John P. Fiske (SBN 249256)
Celeste Evangelisti (SBN 225232)
603 Coast Hwy, Suite G
Solana Beach, California 92075
Telephone: (214) 521-3605
Fiske@BaronBudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Deborah Dixon (SBN 248965)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
DDixon@GomezTrialAttorneys.com

Attorneys for Plaintiffs

1

2                                    **<u>Trial by Jury</u>**

3           Pursuant to the Seventh Amendment to the Constitution of the United States of

4    America, Plaintiff is entitled to, and demands, a trial by jury.

5

6    DATED:  March 24, 2017                    Respectfully Submitted,

7

8                                          By:  s/ John P. Fiske

9                                               John P. Fiske

10
                                           **BARON & BUDD, P.C.**
11                                         Scott Summy (pending *Pro Hac Vice*)
                                           (Texas Bar No. 19507500)
12                                         John P. Fiske (SBN 249256)
                                           Celeste Evangelisti (SBN 225232)
13                                         603 Coast Hwy, Suite G
                                           Solana Beach, California 92075
14                                         Telephone:  (214) 521-3605
                                           Fiske@BaronBudd.com
15
16
                                           **GOMEZ TRIAL ATTORNEYS**
17                                         John H. Gomez (SBN 171485)
                                           Deborah Dixon (SBN 248965)
18                                         655 West Broadway, Suite 1700
                                           San Diego, California 92101
19                                         Telephone:  (619) 237-3490
                                           DDixon@GomezTrialAttorneys.com
20
21                                         Attorneys for Plaintiffs
22

23

24

25

26

27

28

**EXHIBIT A**



**Department of Toxic Substances Control**



**Matthew Rodriquez**
Secretary for
Environmental Protection

Barbara A. Lee, Director
5796 Corporate Avenue
Cypress, California 90630



*Edmund G. Brown Jr.*
Governor

### Proposition 65 Notification
### Pursuant to California Health & Safety Code § 25180.7
### Designated Government Employee Disclosure Requirement

TO:      Wilma Wooten, MD, MPH
Public Health Officer/ Director, Public Health Services
County of San Diego – Health and Human Services Agency
(wilma.wooten@sdcounty.ca.gov)

FROM:    Mr. Shahir Haddad, Supervising Engineer, Brownfields and Environmental
Restoration Program-Cypress Office

DATE:     October 6, 2016

PROPERTY
NAME:     KETEMA AEROSPACE & ELECTRONICS FACILITY

RP NAME:  AMETEK, Inc.

ADDRESS:  KETEMA AEROSPACE & ELECTRONICS FACILITY,
790 GREENFIELD DRIVE EL CAJON, CALIFORNIA 92021

This notification by a designated government employee of the California Department of
Toxic Substances Control ("DTSC") is made pursuant to the state's Safe Drinking Water
and Toxic Enforcement Act of 1986 ("Proposition 65").  More specifically, this
notification is being made pursuant to California Health and Safety Code section
25180.7, which is part of Proposition 65.

DTSC has obtained information in the course of its official duties pertaining to the
property address specified above, indicating that several chemicals have been detected
in soil gas and groundwater at 790 Greenfield Drive in the City of El Cajon.  DTSC has
conducted soil gas, groundwater and indoor air sampling at properties adjacent to this
aerospace manufacturing facility and will be using this information to develop a plan to
further assess surrounding properties and mitigate chemical contamination, as
necessary.  Several of the chemicals detected are considered human carcinogens and
may pose unacceptable short and long term risks to human health and the environment.

Dr. Wilma Wooten
October 6, 2016
Page 2

In September 2016, 29 soil gas samples were collected by an environmental consultant working for the responsible party.  These samples were collected along the adjacent Magnolia Elementary School property fence line.  Trichloroethylene (TCE) is a chemical which has been found in the groundwater and soil gas at the property address and surrounding community.  Vapors off-gassing from underlying contaminated groundwater can migrate through the soil and through cracks in the floor and accumulate in the air inside buildings.  The levels of TCE found in soil gas were up to 560 µg/L, which could potentially exceed indoor air levels that pose an unacceptable risk to human health.

Measures to reduce the risk of breathing in TCE may include increased ventilation, sealing openings in the floor, treating the indoor air, or recommending temporary relocation.

If you have any questions, please feel free to contact me at (714) 484-5368 or Shahir.Haddad@dtsc.ca.gov.

I hereby certify that I am a designated employee and that I have reported the above information concerning a discharge or threatened discharge of hazardous waste to the appropriate officials pursuant to Section 25180.7 of the Health and Safety Code.

Signed _____

Title _SUPERVISING ENGINEER_

Date _10.6.16_

cc   Sayone Thihalolipavan, MD, MPH (via email)
     Deputy Public Health Officer, Public Health Services
     County of San Diego – Health and Human Services Agency
     (sayone.thihalolipavan@sdcounty.ca.gov)

     Elise Rothschild, REHS (via email)
     Director of Environmental Health, Land Use and Environment Group
     County of San Diego - Department of Environmental Health
     (Elise.Rothschild@sdcounty.ca.gov)

     Keith Kezer (via email)
     Program Coordinator, Land Use Program
     County of San Diego - Department of Environmental Health
     (Keith.Kezer@sdcounty.ca.gov)

**EXHIBIT B**





# California Regional Water Quality Control Board, San Diego Region

March 2, 2017

Mr. Jose Bernal
400 Greenfield Drive, Space 19
El Cajon, CA 92021

**Subject:**   **Indoor Air and Crawl Space Sampling Results for 400 Greenfield Drive, Space 19,
El Cajon, California**

Dear Mr. Bernal:

The San Diego Regional Water Quality Board (Water Board) is writing you to inform you of the 24-hour air sampling results taken at your property located at 400 Greenfield Drive, Space 19, El Cajon, CA.

**Test Results**
Air samples from the crawl space and indoor air taken from your property on February 9, 2017, show levels of trichlorethylene (TCE) above the California Department of Toxic Substances Control's screening level of **0.48 micrograms per cubic meter (ug/m³)**. The level of TCE detected in your indoor air was **0.43 ug/m³**. The level of TCE detected in the crawlspace (under your home) was **7.0 ug/m³**.

**What does this mean?**
These are preliminary results. The chemical levels detected do not pose an immediate health risk. However, additional sampling of your home is needed to confirm the results and help determine the next step(s).

**Next Steps**
A representative from ERM, the contractor conducting the air sampling, will contact you shortly to discuss collecting additional air samples at a date and time convenient for you. At least one day prior to the sampling, an ERM representative will meet with you to conduct a survey of chemicals and activities in your home that may affect the air sampling results. During the meeting, all products that may affect the air sample results will be collected and stored outdoors in a container with a tight-fitting lid, until sampling activities are complete. A list of common household sources that may affect sampling results is attached – ***Common Household Sources of Volatile Organic Compounds.***

ERM will be available to discuss the air sampling results in person on Thursday March 2 and Friday, March 3, 2017. Please let us know when you are available.

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

Again, we appreciate your cooperation in this process.

Mr. Bernal — 2 — March 2, 2017

Sincerely,

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
|---|---|
| GeoTracker Global ID | SL209234198 |

**Refer to: Indoor Air and Crawl Space Sampling Results for 400 Greenfield Drive, Space 19, El Cajon, California Letter**

 

## California Regional Water Quality Control Board, San Diego Region

March 2, 2017

Mrs. Gloria Carrillo
400 Greenfield Drive, Space 22
El Cajon, CA 92021

**Subject:      Indoor Air and Crawl Space Sampling Results for 400Greenfield Drive, Space 22, El Cajon, California**

Dear Mrs. Carrillo:

The San Diego Regional Water Quality Board (Water Board) is writing you to inform you of the 24-hour air sampling results taken at your property located at 400 Greenfield Drive, Space 22, El Cajon, CA.

**Test Results**
Air samples from the crawl space and indoor air taken from your property on February 9, 2017, show levels of trichlorethylene (TCE) above the California Department of Toxic Substances Control's screening level of **0.48 micrograms per cubic meter (ug/m³)**. The level of TCE detected in your indoor air was **3.7. ug/m³**. The level of TCE detected in the crawlspace (under your home) was **3.8 ug/m³**.

**What does this mean?**
These are preliminary results. The chemical levels detected do not pose an immediate health risk. However, additional sampling of your home is needed to confirm the results and help determine the next step(s).

**Next Steps**
A representative from ERM, the contractor conducting the air sampling, will contact you shortly to discuss collecting additional air samples at a date and time convenient for you. At least one day prior to the sampling, an ERM representative will meet with you to conduct a survey of chemicals and activities in your home that may affect the air sampling results. During the meeting, all products that may affect the air sample results will be collected and stored outdoors in a container with a tight-fitting lid, until sampling activities are complete. A list of common household sources that may affect sampling results is attached – ***Common Household Sources of Volatile Organic Compounds.***

ERM will be available to discuss the air sampling results in person on Thursday March 2 and Friday, March 3, 2017. Please let us know when you are available.

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

Again, we appreciate your cooperation in this process.

Mrs. Carrillo                              - 2 -                              March 2, 2017

Sincerely,

Sean McClain

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
|-----------------------|-------------|
| GeoTracker Global ID  | SL209234198 |

**Refer to: Indoor Air and Crawl Space Sampling Results for 400 Greenfield Drive, Space 22, El Cajon, California Letter**





## California Regional Water Quality Control Board, San Diego Region

March 2, 2017

Mrs. Ana Hayes
351 E. Bradley St., Space122
El Cajon, CA 92021

**Subject:**     **Indoor Air and Crawl Space Sampling Results for 351 E. Bradley St., Space 122, El Cajon, California**

Dear Mrs. Hayes:

The San Diego Regional Water Quality Board (San Diego Water Board) is writing you to inform you of the 24-hour air sampling results taken at your property located at 351 E. Bradley Street, Space 122, El Cajon, CA.

**Test Results**
Air samples from the crawl space and indoor air taken from your property on February 9, 2017, show levels of trichlorethylene (TCE) above the California Department of Toxic Substances Control's screening level of **0.48 micrograms per cubic meter (ug/m³)**. The level of TCE detected in your indoor air was **1.8. ug/m³**. The level of TCE detected in the crawlspace (under your home) was **2.7 ug/m³**.

**What does this mean?**
These are preliminary results. The chemical levels detected do not pose an immediate health risk. However, additional sampling of your home is needed to confirm the results and help determine the next step(s).

**Next Steps**
A representative from ERM, the contractor conducting the air sampling, will contact you shortly to discuss collecting additional air samples at a date and time convenient for you. At least one day prior to the sampling, an ERM representative will meet with you to conduct a survey of chemicals and activities in your home that may affect the air sampling results. During the meeting, all products that may affect the air sample results will be collected and stored outdoors in a container with a tight-fitting lid, until sampling activities are complete. A list of common household sources that may affect sampling results is attached – *Common Household Sources of Volatile Organic Compounds.*

ERM will be available to discuss the air sampling results in person on Thursday March 2 and Friday, March 3, 2017. Please let us know when you are available.

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

Mrs. Hayes            - 2 -            March 2, 2017

Again, we appreciate your cooperation in this process.

Sincerely,

*Sam M°Clain*

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
| --- | --- |
| GeoTracker Global ID | SL209234198 |

**Refer to: Indoor Air and Crawl Space Sampling Results for 351 E. Bradley St., Space 122, El Cajon, California Letter**





## California Regional Water Quality Control Board, San Diego Region

March 2, 2017

Mr. Alex Masters
400 Greenfield Dr., Space 21
El Cajon, CA 92021

**Subject:    Indoor Air and Crawl Space Sampling Results for 400 Greenfield Drive,
Space 21, El Cajon, California**

Dear Mr. Masters:

The Regional Water Quality Board, San Diego Region (San Diego Water Board) is informing you of the 24-hour air sampling results taken at your property located at 400 Greenfield Drive, Space 21, El Cajon, California.

### Test Results
Air samples from the crawl space and indoor air taken from your property on February 9, 2017, show levels of trichlorethylene (TCE) above the California Department of Toxic Substances Control's screening level of **0.48 microgram per cubic meter (ug/m³)**. The level of TCE detected in your indoor air was **13 ug/m³**. The level of TCE detected in the crawlspace (under your home) was **24 ug/m³**.

### What does this mean?
These are preliminary results. The chemical levels detected do not pose an immediate health risk. However, additional sampling of your home is needed to confirm the results and help determine the next step(s). In order to reduce the levels of TCE in your home, AMETEK will provide an air purifying unit.

### Next Steps
A representative from ERM, the contractor conducting the air sampling, will contact you shortly to discuss collecting additional air samples at a date and time convenient for you. At least one day prior to the sampling, an ERM representative will meet with you to conduct a survey of chemicals and activities in your home that may affect the air sampling results. During the meeting, all products that may affect the air sample results will be collected and stored outdoors in a container with a tight-fitting lid, until sampling activities are complete. A list of common household sources that may affect sampling results is attached – ***Common Household Sources of Volatile Organic Compounds (VOCs).***

ERM will be available to discuss the air sampling results in person on Thursday March 2 and Friday, March 3, 2017. Please let us know when you are available.

Mr. Masters                                 - 2 -                              March 2, 2017

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

Again, we appreciate your cooperation in this process.

Sincerely,

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
|---|---|
| GeoTracker Global ID | SL209234198 |

**Refer to: Indoor Air and Crawl Space Sampling Results for 400 Greenfield Drive, Space 21, El Cajon, CA Letter**





# California Regional Water Quality Control Board, San Diego Region

March 2, 2017

Mrs. Jeanette Hurley
351 E. Bradley St., Space135
El Cajon, CA 92021

**Subject:**   **Indoor Air and Crawl Space Sampling Results for 351 E. Bradley St., Space 135, El Cajon, California**

Dear Mrs. Hurley:

The San Diego Regional Water Quality Board (Water Board) is writing you to inform you of the 24-hour air sampling results taken at your property located at 351 E. Bradley Street, Space 135, El Cajon, CA.

**Test Results**
Air samples from the crawl space and indoor air taken from your property on February 9, 2017, show levels of trichlorethylene (TCE) above the California Department of Toxic Substances Control's screening level of **0.48 micrograms per cubic meter (ug/m³)**. The level of TCE detected in your indoor air was **2.6 ug/m³**. The level of TCE detected in the crawlspace (under your home) was **2.2 ug/m³**.

**What does this mean?**
These are preliminary results. The chemical levels detected do not pose an immediate health risk. However, additional sampling of your home is needed to confirm the results and help determine the next step(s).

**Next Steps**
A representative from ERM, the contractor conducting the air sampling, will contact you shortly to discuss collecting additional air samples at a date and time convenient for you. At least one day prior to the sampling, an ERM representative will meet with you to conduct a survey of chemicals and activities in your home that may affect the air sampling results. During the meeting, all products that may affect the air sample results will be collected and stored outdoors in a container with a tight-fitting lid, until sampling activities are complete. A list of common household sources that may affect sampling results is attached – *Common Household Sources of Volatile Organic Compounds.*

ERM will be available to discuss the air sampling results in person on Thursday March 2 and Friday, March 3, 2017. Please let us know when you are available.

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

Again, we appreciate your cooperation in this process.

Mrs. Hurley                          - 2 -                          March 2, 2017

Sincerely,

*Sean McClain*

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
| --- | --- |
| GeoTracker Global ID | SL209234198 |

**Refer to: Indoor Air and Crawl Space Sampling Results for 351 E. Bradley St., Space 135, El Cajon, California Letter**





EDMUND G. BROWN JR.
*GOVERNOR*

MATTHEW RODRIGUEZ
*SECRETARY FOR
ENVIRONMENTAL PROTECTION*

# California Regional Water Quality Control Board, San Diego Region

March 8, 2017

Mr. James Ellis
351 E Bradley, Space No. 165
El Cajon, CA 92021

**Subject:** **Indoor Air and Crawl Space Sampling Results for 351 E Bradley, Space 165, El Cajon, California**

Mr. Ellis:

This letter is to inform you of the 24-hour air sampling results for TCE, one of the chemicals associated with groundwater impacts from the former KETEMA facility.

**Test Results**
Results of air samples taken from your property on February 9, 2017, show low levels of trichlorethylene (TCE) above the California Department of Toxic Substances Control's screening level of **0.48 micrograms per cubic meter (ug/m³)**. The concentration of TCE detected in your indoor air was **0.73 ug/m³**, which slightly exceeds the screening level and is similar to the concentration of TCE measured in ambient air (outdoor air). The level of TCE detected in the crawlspace (under your home) was **0.42 ug/m³**, which <u>does not exceed</u> the screening level of **0.48 ug/m³**.

**What does this mean?**
TCE is present at a low level and does not pose an immediate health risk.   However, we will continue to monitor the situation and may wish to resample your home in the coming months.

**Next Steps**
A representative from ERM, the contractor conducting the air sampling, will contact you to schedule a time to discuss these air sampling results with you in person.

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

We appreciate your cooperation in this process.

Sincerely,

*Sean McClain*

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
|---|---|
| GeoTracker Global ID | SL209234198 |

—





# California Regional Water Quality Control Board, San Diego Region

March 8, 2017

Mr. Steve Duhamel
351 E Bradley, Space No. 166
El Cajon, CA 92021

**Subject:**   **Indoor Air and Crawl Space Sampling Results for 351 E Bradley, Space 166, El Cajon, California**

Mr. Duhamel:

This letter is to inform you of the 24-hour air sampling results for TCE, one of the chemicals associated with groundwater impacts from the former KETEMA facility.

### Test Results
Results of air samples from the crawl space (under your home) and indoor air taken from your property on February 9, 2017, show low levels of trichlorethylene (TCE) slightly above the California Department of Toxic Substances Control's screening level of **0.48 micrograms per cubic meter (ug/m³)**. The concentration of TCE detected in your indoor air was **0.51 ug/m³**. The concentration of TCE detected in the crawlspace (under your home) was **0.63 ug/m³.**

### What does this mean?
TCE is present at a low level and does not pose an immediate health risk. However, we will continue to monitor the situation and may wish to resample your home in the coming months.

### Next Steps
A representative from ERM, the contractor conducting the air sampling, will contact you to schedule a time to discuss these air sampling results with you in person.

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

We appreciate your cooperation in this process.

Sincerely,

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
|---|---|
| GeoTracker Global ID | SL209234198 |





# California Regional Water Quality Control Board, San Diego Region

March 2, 2017

Mrs. Alejandra Samaniego
351 E. Bradley St., Space 167
El Cajon, CA 92021

**Subject:**   **Indoor Air and Crawl Space Sampling Results for 351 E. Bradley St., Space 167, El Cajon, California**

Dear Mrs. Samaniego:

The San Diego Regional Water Quality Board (Water Board) is writing you to inform you of the 24-hour air sampling results taken at your property located at 351 E. Bradley Street, Space 167, El Cajon, CA.

**Test Results**
Air samples from the crawl space and indoor air taken from your property on February 9, 2017, show levels of trichlorethylene (TCE) above the California Department of Toxic Substances Control's screening level of **0.48 micrograms per cubic meter (ug/m³)**. The level of TCE detected in your indoor air was **2.5 ug/m³**. The level of TCE detected in the crawlspace (under your home) was **0.72 ug/m³**.

**What does this mean?**
These are preliminary results. The chemical levels detected do not pose an immediate health risk. However, additional sampling of your home is needed to confirm the results and help determine the next step(s).

**Next Steps**
A representative from ERM, the contractor conducting the air sampling, will contact you shortly to discuss collecting additional air samples at a date and time convenient for you. At least one day prior to the sampling, an ERM representative will meet with you to conduct a survey of chemicals and activities in your home that may affect the air sampling results. During the meeting, all products that may affect the air sample results will be collected and stored outdoors in a container with a tight-fitting lid, until sampling activities are complete. A list of common household sources that may affect sampling results is attached – ***Common Household Sources of Volatile Organic Compounds.***

ERM will be available to discuss the air sampling results in person on Thursday March 2 and Friday, March 3, 2017. Please let us know when you are available.

For questions regarding the air sampling results please contact:
- Gina Rogers, ERM at (949) 623-4690 or gina.rogers@erm.com
- Dr. Mary McDaniel at (310) 392-6462 or mmcdaniel@intrinsik.com

Again, we appreciate your cooperation in this process.

Mrs. Samaniego                          - 2 -                          March 2, 2017

Sincerely,

SEAN MCCLAIN, PG
Engineering Geologist
Central Cleanup Unit

| Tech Staff Info & Use | |
|---|---|
| GeoTracker Global ID | SL209234198 |

**Refer to: Indoor Air and Crawl Space Sampling Results for 351 E. Bradley St., Space 167, El Cajon, California Letter**