**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
John P. Fiske (SBN 249256)
Celeste Evangelisti (SBN 225232)
Jason Julius (SBN 249036)
603 Coast Hwy, Suite G
Solana Beach, California 92075
Telephone: (214) 521-3605
Fiske@BaronBudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Deborah Dixon (SBN 248965)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
DDixon@GomezTrialAttorneys.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ADAM COX, individually, by and through his durable power of attorney, VICTOR COX, and on behalf of himself and others similarly situated; MARIA OVERTON, individually, and on behalf of herself and others similarly situated; JORDAN YATES, individually, and on behalf of himself and others similarly situated; ,

Plaintiff,

v.

AMETEK, INC., a Delaware corporation; THOMAS DEENEY, individually; SENIOR OPERATIONS LLC, a limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No.: 3:17-cv-00597-GPC-AGS

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Negligence**
2. **Gross Negligence**
3. **Private Nuisance**
4. **Public Nuisance**
5. **Trespass**

**DEMAND FOR A JURY TRIAL**

Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based on information and belief:

## INTRODUCTION

1. On October 6, 2016, the California Department of Toxic Substances Control ("DTSC") issued a Proposition 65 Notification to the San Diego County Public Health Officer, stating:

a. "DTSC has obtained information in the course of its official duties pertaining to the property address specified above, indicating that several chemicals have been detected in soil gas and groundwater at 790 Greenfield Drive in the City of El Cajon. DTSC has conducted soil gas, groundwater and indoor air sampling at properties adjacent to this aerospace manufacturing facility and will be using this information to develop a plan to further assess surrounding properties and mitigate chemical contamination, as necessary. Several of the chemicals detected are considered human carcinogens and may pose unacceptable short and long term risks to human health and the environment."

b. "In September 2016, 29 soil gas samples were collected by an environmental consultant working for the responsible party. These samples were collected along the adjacent Magnolia Elementary School fence line. Trichloroethylene (TCE) is a chemical which has been found in the groundwater and soil gas at the property address and surrounding community. Vapors off-gassing from underlying contaminated groundwater can migrate through the soil and through cracks in the floor and accumulate in the air inside buildings. The levels of TCE found in soil gas were up to 560 ug/L, which could potentially exceed indoor air levels that pose an unacceptable risk to human health."

c. The Proposition 65 Notification lists Ametek, Inc. as the Responsible Party under "RP Name."

d. The Proposition 65 Notification is attached hereto as Exhibit A.

e. Plaintiff's mobile home is located on property adjacent to Magnolia Elementary School.

2. In March 2017, the California Regional Water Quality Control Board (RWQCB) sent letters to eight residents at the Greenfield and Starlight mobile home parks (MHPs). These MHPs are located immediately adjacent to, and hydrogeologically down-gradient from Magnolia Elementary School and/or the Senior Aerospace facility located at 790 Greenfield Drive. The letters were sent in response to sampling of air conducted by Ametek, Inc.'s consultant, ERM, within and beneath these eight mobile homes. The letters indicate the concentrations of trichloroethylene (TCE) in these air samples, and document additional actions to be taken at each mobile home. ERM collected the air samples for Ametek, a party responsible for soil, soil vapor, and groundwater contamination associated with releases at the facility at 790 Greenfield Drive.

a. TCE was detected in air samples from inside the mobile homes and in the crawl spaces beneath the homes at concentrations up to 13 and 24 micrograms per cubic meter (ug/m3), respectively. The California Department of Toxic Substances Control (DTSC) screening level for TCE is 0.48 ug/m3. The air samples taken at the homes exceeded this level in six of the indoor air samples and seven of the crawl space air samples. In fact, some concentrations at these homes exceed the regulatory Accelerated Response Action Level (2 ug/m3) and/or the Urgent Response Action Level (8 ug/m3), established as health and safety thresholds in California. California's Urgent Response Action Level requires "immediate mitigation measures within a few days." Unfortunately, we know now the plume has been there for over 40 years.

b. The eight letters from the RWQCB are attached hereto as Exhibit B.

c. Plaintiffs' mobile home units are located above the same TCE plume, causing the same or substantially similar TCE crawl space and indoor air exposure and human health risk as recorded in the February 2017 samples.

3. In April 2017, soil vapor samples were taken from various locations around the subject MHPs. TCE was detected in soil vapor samples from the MHP properties at concentrations up to 360 micrograms per liter (ug/l).

## PARTIES

4. Plaintiff Adam Cox is a citizen of the State of Arizona and a resident of the County of Yavapai. Victor Cox brings each and every allegation as attorney in fact, pursuant to a durable power of attorney, for his incompetent brother, Plaintiff Adam Cox.

5. Plaintiff Adam Cox was the owner of mobile home trailer Unit 111, situated on real property in the Villa Cajon Mobile Home Estate ("Villa Cajon"), a mobile home park located in El Cajon California. Plaintiff leased the real property upon which Villa Cajon Unit 111 is located. Villa Cajon Unit 111 was, until recently, Plaintiff's primary residence.

6. Plaintiff Adam Cox owned Villa Cajon Unit 111, and lived there until December 2016.

7. Plaintiff started living in Villa Cajon Unit 111 in approximately 1986. Prior to that, he lived in Villa Cajon Unit 110 with his mother Arla JoDoell Cox, starting in 1976.

8. Arla Cox owned Villa Cajon Unit 110 starting in approximately 1976. In approximately 1986, Arla Cox sold unit Villa Cajon 110 and purchased and moved into Unit Villa Cajon 111 with Plaintiff Adam Cox.

9. Arla Cox, a non-smoker, died from a kidney tumor at the age of 63 in 2002.

/ / /

10. Plaintiff Adam Cox, a non-smoker, was diagnosed in December 2016 with a brain tumor at the base of his skull. Adam lived in and owned Villa Cajon Unit 111 from 1986 until December 2016, when he moved to a healthcare facility as the result of failing health due to his brain tumor. Plaintiff Adam Cox sold Villa Cajon Unit 111 in April 2017 due to his deteriorating health and inability to live on his own any longer.

11. Villa Cajon Units 110 and 111 are on top of the TCE plume.

12. Plaintiff Maria Overton, is a citizen of the State of California and a resident of the County of San Diego.

13. Plaintiff Maria Overton is the owner of mobile home trailer Unit 92, situated on real property in the Greenfield Mobile Home Park ("Greenfield"), a mobile home park located in El Cajon, California. Plaintiff leases the real property upon which Greenfield Unit 92 is located. Greenfield Unit 92 is Plaintiff Maria Overton's primary residence, and has been since approximately 2005.

14. In 2016, Plaintiff Maria Overton was diagnosed with colon cancer.

15. Greenfield Unit 92 is on top of the TCE Plume.

16. Plaintiff Jordan Yates is a citizen of the State of California and a resident of the County of El Cajon.

17. Plaintiff Jordan Yates was a resident of a mobile home trailer situated on real property in the Villa Cajon mobile home park located in El Cajon, California. Plaintiff lived in the mobile home unit with his parents from the time he was born in 1985 until the age of 12 in 1997. During that, this particular mobile home unit was Plaintiff Jordan Yates's primary residence.

18. Villa Cajon, Greenfield, and Starlight Mobile Home Park ("Starlight") are adjacent to 790 Greenfield Drive ("AMETEK PROPERTY"), and have been contaminated by a toxic groundwater plume emanating from the same. The mobile home parks are not parties to this action.

19. Defendant Ametek, Inc. is a Delaware corporation with its principal place of business in Pennsylvania. Defendant Senior Operations, LLC is a Delaware limited

liability company with its principal place of business in Illinois. Defendant Thomas Deeney is a natural person who resides in Pennsylvania.

20. Defendant AMETEK, INC. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1100 Cassatt Road, Berwyn, Pennsylvania 19312 ("AMETEK").

21. Defendant SENIOR OPERATIONS LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 300 East Devon Avenue, Bartlett, Illinois 60103. SENIOR OPERATIONS LLC wholly owns a division named SENIOR AEROSPACE KETEMA, which is located at 790 Greenfield Drive, El Cajon, California 92021 ("SENIOR/KETEMA").

22. Defendant THOMAS DEENEY is a natural person who resides in Pennsylvania and who is a corporate officer and employee of Defendant AMETEK, INC. Defendant THOMAS DEENEY is responsible by act or omission, gross negligence, negligence or otherwise, for the occurrences herein alleged, and for Plaintiff's resulting harm. At times relevant to this Complaint, Defendant THOMAS DEENEY acted as the agent, servant, and/or employee of AMETEK, and was acting within the course and scope of said agency and employment.

23. Unless otherwise indicated, the use of any Defendant's name in this Complaint, including "Defendants," includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of the named Defendants.

24. The true names and capacities of the defendants named herein as Does 1 through 100, inclusive, whether individual, corporate, governmental, associate or otherwise, are unknown to Plaintiffs, who therefore sues such Defendants by fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Each of the Doe Defendants is responsible in some manner, either by act or omission, strict liability, fraud, negligence or otherwise, for the occurrences herein alleged, and Plaintiffs' harm was legally caused by conduct of the Doe

Defendants. Does 1 through 100, inclusive, are responsible to Plaintiff on the facts and theories herein alleged. At all relevant times, each Defendant, including those fictitiously named, was the agent, servant, and/or employee of each of the remaining Defendants, and was acting within the course and scope of said agency and employment. Each of the Defendants is in some manner responsible for the events and happenings to which reference is made herein, and each Defendant caused injury and damage to Plaintiff as herein alleged. The acts of Defendants and each of them were and are the acts of the other Defendants. Defendants, and each of them, ratified, authorized, and/or approved of the acts of the other Defendants.

## JURISDICTION AND VENUE

25. Diversity Jurisdiction exists under 28 U.S.C. §1332 because all Plaintiffs are or were residents of and/or owned subject trailer units in California, but all Defendants are residents of or have principal places of business in states outside of California.

26. Venue is proper in this Court in that the subject acts and transactions giving rise to this action occurred in the Southern District of California for the following reasons:

a. Defendants do or did conduct business in the Southern District of California and have intentionally availed themselves of the laws and markets within Southern District of California by owning and operating, or having owned and operated, the subject aerospace plant which is the source of the subject contamination, at 790 Greenfield Drive in El Cajon, California;

b. The injury and harm to Plaintiffs, as current or former San Diego County residents, occurred and is still occurring within the Southern District of California in the City of El Cajon.

c. The entire toxic groundwater plume, which is the subject of this lawsuit, is within the Southern District of California.

d. Two "Related" actions are currently filed in the Southern District of California, and this case should be Related to those actions.

e. All property is located within the Southern District of California.

## FACTUAL ALLEGATIONS

**Companies' History**

27. In 1953 or 1954, the AMETEK PROPERTY was founded by California Aircraft Products on the current El Cajon, California site, at 790 Greenfield Drive, El Cajon, California 92021. In 1964, California Aircraft Products changed its name to Straza Industries, which was purchased by Defendant AMETEK in 1968.[1]

28. AMETEK used the AMETEK PROPERTY to manufacture aircraft engine parts from 1968 to 1988.[2]

29. In late 1987/early 1988, AMETEK learned it created a groundwater plume contaminated with chlorinated solvents, including TCE at 39,000 ug/L, because it dumped and stored toxic waste in a redwood sump, which leached and leaked chlorinated solvents, among other chemicals, into the groundwater and subsurface soil. By late 1987/early 1988, AMETEK knew the contaminated groundwater plume had migrated from its property and into the downgradient groundwater beyond its western property boundary.

30. In late 1988, AMETEK "spun off" a company called Ketema. The "spin off" included the property and business at 790 Greenfield Drive, from which the toxic plume was emanating.

/ / /

---

[1] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-201, dated September 2008.

[2] *Id.*

31. Prior to and at the time AMETEK spun off Ketema, AMETEK knew it had contaminated the groundwater with TCE concentrations as high as 39,000 ug/L.

32. By 1997, Senior Operations, LLC (a.k.a. Senior Flexonics) had purchased the property and business at 790 Greenfield Drive.

33. Ketema changed its name to Schutte & Koerting, which filed for bankruptcy in 2007.

34. Currently, the AMETEK PROPERTY is owned by Defendant Senior Operations, LLC, apparently doing business as SENIOR AEROSPACE KETEMA, which has its principal place of business at 790 Greenfield Drive, El Cajon, California 92021 ("KETEMA").[3]

35. KETEMA is AMETEK spelled backwards.

36. Despite knowledge of groundwater contamination at extremely high levels, AMETEK made a cold, calculated business decision to simply walk away without any effort to clean up or remediate the groundwater contamination.

**AMETEK Dumped Chlorinated Solvents into a Hole in the Ground**

37. By 1963, Straza/AMETEK had dug a hole in the ground, which was 12 feet in diameter and 10 feet deep. This hole was used as a waste "SUMP."[4]

38. Straza/AMETEK lined the walls of the SUMP with redwood planks and poured concrete at its base. AMETEK used this SUMP for toxic waste storage and dumping until 1985.[5]

39. Between 1963 and 1985, for 22 years, Straza/AMETEK dumped up to 7,000 gallons of waste per month into this SUMP. This dumped waste included[6]:

---

[3] SENIOR AEROSPACE KETEMA website, www.saketema.com/history.

[4] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-201, dated September 2008.

[5] *Id.*

a. Spent acid and alkaline solutions

b. Industrial chlorinated solvents

c. 1, 1, 1- Trichloroethane (1, 1, 1- TCA)

d. Trichloroethylene (TCE)

e. Tetrachloroethylene (PCE)

f. Oils

g. Paint thinner

h. Process Sludge

40. In 1963, Straza/AMETEK submitted a Report of Waste Discharge (ROWD) to the California Regional Water Quality Control Board in order to receive authority and permission to use the SUMP as an impervious storage vessel. AMETEK represented to the Regional Water Quality Control Board that their waste treatment facility would "prevent filtering into native soil" in a February 7, 1963 letter.[7]

41. AMETEK did not reveal the nature or design of the SUMP, excluding the details that the SUMP was lined with redwood planks. It was not until removal of the SUMP, decades later, that the San Diego County Department of Environmental Health discovered and photographed the redwood planks.[8]

42. Highly acidic liquid waste, spent chlorinated solvents, and appreciable amounts of various metallic wastes breached the sump and discharged into soil surrounding the sump and into the groundwater, as AMETEK dumped the chlorinated solvent waste into the SUMP until 1985.[9]

/ / /

/ / /

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

43. Between 1963 and at least 1985, the strong, acidic liquid waste deteriorated the SUMP allowing the chlorinated solvent waste to seep and percolate into the surrounding soil, fractures in the granite rock, and into the groundwater.[10]

44. In 1987, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 810,000 parts per billion (ppb).[11]

45. In 2007, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 48,000 parts per billion (ppb).[12]

46. The 1987 and 2007 concentration levels exceed state water quality objectives by unthinkable magnitudes. A chart from the Regional Water Board's 2008 Administrative Liability Complaint illustrates the excessive pollution caused by AMETEK:[13]

Table 1

| Waste Constituent | Ground-Water Concentration [a] (ug/l) | Basin Plan Water Quality Objective (ug/l) |
|---|---|---|
| Tetrachloroethylene (PCE) | 5,400 | 5 |
| Trichloroethylene (TCE) | 40,000 | 5 |
| 1,1-Dichloroethylene (1,1-DCE) | 1,300 | 6 |
| 1,1,1 – Trichloroethane (1,1,1-TCA) | 270 | 200 |
| 1,4 - Dioxane | 800 | 3* |

* California Department of Public Health advisory Notification Level (NL).
[a] Data from the December 2007 Groundwater Monitoring Report.

/ / /

/ / /

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

**One of the Largest TCE Plumes in the State of California**

47. AMETEK'S waste discharge caused one of the largest TCE/chlorinated solvent plumes in the State of California.[14]

48. The chlorinated solvent plumes are massive, possibly extending 1.3 miles westward and down-gradient. The plumes include the following chemicals and dimensions[15]:

a. TCE: 7,000 feet by 1,600 feet, migrated beneath 257 acres of land

b. DCE: 3,200 feet by 1,200 feet, migrated beneath 88 acres of land

c. Dioxane: 5,600 by 1,000 feet, extends across 128 acres of land

d. TCA: 1,200 feet by 400 feet, extends beneath 11 acres

49. Additionally, plumes of PCE, 1,1-DCA, benzene, toluene, ethylbenzene, and xylene exist in the groundwater.[16]

50. According to AMETEK'S consultants, ERM, the plume has contaminated the groundwater and soil beneath Magnolia Elementary School, GREENFIELD, STARLIGHT, VILLA CAJON, and other neighboring properties.

**AMETEK'S Water Quality Violations**

51. The California Regional Water Quality Control Board filed the 2008 Administrative Liability Complaint against Defendant AMETEK, INC. for failing to comply with the previous 2002 Cleanup and Abatement Order No. R9-2002-201.[17] AMETEK, INC. committed the following violations[18]:

a. Failure to Report as Required by Directive No. 1: "Ametek failed to install and collect ground-water samples in accordance with Directive

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

1.e and failed to submit a complete Delineation Report by April 30, 2003….. the total number of days of violation is 1,974 days."

b. Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3: "Ametek failed to submit a complete Feasibility Study Report by January 16, 2004….. the total number of days of violation is 1,713 days."

52. The California Regional Water Quality Control Board then imposed a fine of $2,269,000 for the above mentioned violations[19]:

a. "$1,671,500 in liability for Failure to Report as Required by Directive No. 1…."

b. "$597,500 in liability for Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3…."

**Ametek and Tom Deeney Knowingly, Willfully, and Intentionally Failed to Cleanup and Abate the Contamination**

53. AMETEK and DEENEY knowingly, willfully, and intentionally failed to establish monitoring wells, which were intended to identify the boundaries of and delineate the massive plume. In the 2008 Administrative Liability Complaint, the California Water Board documented AMETEK'S willful, knowing, and intentional failures[20]:

a. "After 20 years of investigation efforts, Ametek and S&K have not installed a sufficient monitoring well network to delineate the vertical and horizontal extent of the waste plume and have not taken any efforts to cleanup and abate the effects of their discharge."

---

[19] *Id.*

[20] Technical Analysis for Administrative Liability Complaint No. R9-2008-0033, September 2008.

b. "Ametek and S&K are responsible for delineating and remediating the discharge of wastes."

c. "Ametek and S&K were repeatedly advised that their submittals regarding plume delineation were incomplete or deficient, yet they failed to conduct additional work to address the deficiencies."

d. "Ametek and S&K's failure to completely delineate the plume has allowed significant concentrations of contaminants to remain in place as a continued source of pollution."

e. "Ametek and S&K failed to act appropriately, not only in their efforts to complete the delineation of the plume, but in their responsibilities to implement appropriate cleanup and abatement measures in a reasonable amount of time."

f. "Such failures have caused a condition of pollution and contamination in the ground water beneath the El Cajon Valley with continuing impacts to the existing beneficial uses of the Santee/El Monte Basin."

54. AMETEK was named a "Responsible Party" in Cleanup and Abatement Order 98-11 in 1998 by the California Regional Water Quality Control Board ("CRWQCB"). AMETEK was required, among other things, to fully delineate the plume, submit a Feasibility Study, submit a Remedial Action Plan, and otherwise fully comply with CAO 98-11.

55. AMETEK and DEENEY choose to not comply with CAO 98-11.

56. The CRWQCB sent many, many letters and Notices of Violation ("NOVs") to AMETEK and DEENEY regarding the lack of compliance with CAO 98-11. AMETEK and DEENEY simply ignored the CRWQCB letters and NOVs, allowing the plume to continue to contaminate properties, including causing vapor intrusion into the mobile homes such as the ones owned and/or occupied by Plaintiffs.

57. The CRWQCB again named AMETEK in Cleanup and Abatement Order R9-2002-201. Again, AMETEK and DEENEY choose to not comply. Again, the

CRWQCB sent many, many letters and NOVs. And, again, AMETEK and DEENEY simply ignored the CRWQCB, further allowing the plume to continue to contaminate properties, including mobile homes such as the ones owned and/or occupied by Plaintiffs.

**<u>Magnolia Elementary School - An Adjacent Property</u>**

58. On June 1, 2015, the Board of Governors of the Cajon Valley Union School District voted unanimously to close Magnolia Elementary School, another property located adjacent to the three mobile home parks, for the 2015-2016 school year because the indoor air was contaminated with toxic chemicals. These chemicals, which Defendants improperly dumped on their adjacent property over many years, contaminate the groundwater and soil under the school and the adjacent mobile home parks, including the groundwater and soil located on the real property where Plaintiffs' trailers are or were situated.

59. To mitigate the intrusion of TCE vapors into indoor air at Magnolia Elementary School, Cajon Valley Union School District installed sub-slab depressurization systems, designed to remove toxic vapors from underneath classroom buildings.

60. In 2008, the Department of Toxic Substances Control (DTSC) entered into a Consent Order with AMETEK, documenting the following[21]:

a. "In June 2007, samples taken from ground water monitoring wells showed concentration of TCE of up to 50,000 micrograms per liter beneath the former Ketema facility, and up to 3,600 micrograms per liter beneath the Site."[22]

---

[21] Consent Order, Department of Toxic Substances Control, California Environmental Protection Agency, Docket No. HAS-CO 07/08-198, 2008.

[22] "Site" means Magnolia Elementary School.

b. "The corresponding modeled indoor air exposure at this level corresponds to a lifetime cancer risk in excess of one-in-ten-thousand ($10^{-4}$) at the Site. The TCE groundwater plume is impacting the Site."

c. "Soil gas and indoor air quality sampling conducted between July 2004 and August 2005 at the Site showed TCE concentrations in the subsurface at up to 130 parts per billion by volume and inside the classrooms at levels up to 1.6 micrograms per cubic meter, as reported in "Results of Soil Vapor and Air Testing" dated May 27, 2005, and the "Results of Indoor Air Sampling" dated August 26, 2005."

d. "Exposure at this level corresponds to a lifetime cancer risk in excess of one-in-a-million ($10^{-6}$)."

61. In 2008, the DTSC identified the "Health Effects" of the chlorinated solvents and chemicals AMETEK had dumped into its SUMP[23]:

a. "Volatile Organic Compounds (VOCs) detected at the former Ketema facility and the Site include: 1) benzene, 2) chlorinated solvents, such as TCE, PCE, and 1,1 DCE."

b. "Exposure to such chemicals may occur by inhalation of vapors coming from soil and groundwater, as well as ingestion of, and dermal contact with, VOCs in soil or water."

c. "Potential health effects include cancer, liver and kidney damage, respiratory impairment and central nervous system effects."

62. In 2008, the DTSC identified the "Routes of Exposure" of those chlorinated solvents and chemicals[24]:

a. "Certain activities conducted at the former Ketema facility have contaminated soil and groundwater. Because the contaminants found on

---

[23] *Id.*

[24] *Id.*

the former Ketema facility and under the Site include VOCs, an assessment of all exposure routes will be conducted."

b. "The potential routes of exposure include inhalation, ingestion, and dermal contact."

63. In 2008, the DTSC also identified the "Public Health and/or Environmental Risks"[25]:

a. "Contaminants have been found in the soil and groundwater at the former Ketema facility and the Site. Risks from these contaminants may be caused by exposure to soil vapor, soils and/or groundwater, through ingestion, inhalation of dusts, and/or vapors, and dermal contact."

b. "The groundwater is relatively shallow at the Site and indoor from groundwater via soil vapor was confirmed at the Site."

64. Since 2012, the DTSC has recommended quarterly monitoring of indoor air quality in classrooms and quarterly monitoring of soil gas at Magnolia Elementary School, located adjacent to Greenfield, Starlight and Villa Cajon, the real property upon which Plaintiffs' mobile home units are or were situated.[26]

65. In November 2014, the DTSC evaluated indoor air quality test results:[27]

a. "Detection of TCE within one room (Room 8) exceeded the accelerated response action level for residential exposure scenarios (2 ug/m3)…."

b. "PCE was detected in indoor air within several rooms, with one detection in Room 19 (3.1 ug/m3) exceeding DTSC's modified air screening level for industrial exposure scenarios (2.08 ug/m3) and two detections (Rooms 11

---

[25] *Id.*

[26] Letter to Mr. James Beard, Cajon Valley School District, from Shahir Haddad, P.E., Supervising Engineer, Department of Toxic Substances Control, November 17, 2014.

[27] *Id*, attached Memorandum, SOIL VAPOR SURVEY AND INDOOR AIR QUALITY ASSESSMENT, From Patrick Kerzic, PhD, DABT, Staff Toxicologist, November 3, 2014.

and 19) exceeding DTSC's modified air screening level for residential exposure."

c. "Analysis of several indoor air contaminants (PCE, TCE, 1,1-DCE, 1,1,1-TCA, and 1,1-DCA) which likely appear in indoor air due to vapor intrusion and are found in nearby soil vapor wells, using a Schools Risk Screening Model (Schoolscreen, developed by the Office of Environmental Health Hazard Assessment (OEHHA)) indicates that both cancer risks and health hazards to on site staff and students may approach or exceed DTSC's points of departure for cancer risk (1 in one million excess risk) and hazards (hazard index of 1.0)."

66. In November 2014, the DTSC made conclusions and recommendations: [28]

a. "Recent sampling of indoor and ambient air is consistent with vapor intrusion from contaminants in the subsurface into classrooms at Magnolia Elementary School."

b. "Precautionary actions should be taken to increase ventilation in all classrooms."

c. "In order to confirm detections of contaminants within indoor air, an additional round of air sampling should be performed as soon as possible."

d. "HERO (Human and Ecological Risk Office) supports the recommendation of a human health risk assessment for staff and students at Magnolia Elementary School."

**<u>Magnolia - The December 2014 Vapor Intrusion Air Quality Test Results</u>**

67. After November 2014, in December 2014, indoor air quality was tested, and the results showed a spike in indoor air vapor intrusion.

68. On May 7, 2015, the DTSC held a Community Update Meeting for Magnolia Elementary School, at which several teachers and parents of Magnolia

---

[28] *Id.*

students attended. The DTSC interpreted results from the December 2014 vapor intrusion test results.

69. As part of the meeting, the DTSC gave a presentation, including the following slides and information[29]:

70.




71.




[29] Presentation at Community Update Meeting for Magnolia Elementary School, Schools Evaluation and Brownfields Outreach, California Department of Toxic Substances Control, May 7, 2015.

72.

## Previous Sampling Events and Results

| | Cancer Risk | Additional Risk in One Million |
|---|---|---|
| August 2014 | $4.5x10^{-6}$ | 4.5 |
| December 2014 | $4.2x10^{-5}$ | 42 |
| March 2015 | $5.6x10^{-6}$ | 5.6 |

Department of Toxic Substances Control

73.

## DTSC's Risk Management Range

Highest cancer risk estimated Dec 2014: $4.2x10^{-5}$




Highest cancer risk estimated March 2015: $5.6x10^{-6}$

Source: DTSC Vapor Intrusion Public Participation Advisory

Department of Toxic Substances Control

74. The cancer risk for the December 2014 and the March 2015 levels are above the "ACCEPTABLE" range and entering the red zone. The cancer risk for the December 2014 levels are in the red.

/ / /

75. The cancer risk appears to reach levels 42 times the threshold level which guides the DTSC to take action.

76. The groundwater and air contamination includes chemicals such as TCE (Trichloroethylene), PCE (Tetrachloroethylene), and other chlorinated solvents. These chemicals are known to cause cancer and other serious health effects in humans.

77. Defendants' active dumping and continued contamination is wanton, reckless, and rife with cold corporate cost calculations, warranting punitive and exemplary damages.

78. In continuing to improperly dump chemicals and failing to clean up, Defendants made calculated business decisions and actively avoided compliance with regulatory orders to identify the size and scope of the contamination.

79. Based on current data from Defendant AMETEK's own consultants, it appears an active source of "free product" continues to contaminate the groundwater and soil underneath the mobile home parks, including the real property upon which Plaintiffs' trailers are or were situated, and will do so for decades if not centuries if nothing is done to address the situation.

**Vapor Intrusion at the Mobile Home Parks**

80. Despite the plume's existence for over 40 years, and despite the existence of a Cleanup and Abatement Order since 1998, the first indoor air and crawl space vapor sampling did not take place until February 2017, after two related lawsuits were filed.

81. The CRWQCB required AMETEK, as the Responsible Party, to sample the air and crawl space of mobile homes at Greenfield and Starlight MHPs. The positive results from that air sampling became known to Plaintiffs in March 2017. This was the first time the mobile homes were tested for vapor intrusion.

82. The results of the mobile home sampling revealed TCE vapor intrusion into the indoor air and crawl space at levels up to 13 ug/m3 and 24 ug/m3, respectively. These results, in addition to other results, exceed the California residential screening

level of .48 ug/m$^3$, and/or the Accelerated Response Action Level of 2 ug/m$^3$, and/or the Urgent Response Action Level of 6 ug/m$^3$.

83. Thus, TCE vapor intrusion is documented in the indoor air and crawl space of mobile homes at the mobile home parks. The mobile home units where Plaintiffs currently or formerly resided are situated on the groundwater contamination plume causing this indoor air intrusion.

**<u>Defendants' Conscious Choice to Ignore the Continuous Contamination</u>**

84. Based on information and belief, and according to review of current and historical technical and legal documents, it appears 790 Greenfield Drive is still contaminated with toxic chemicals that provide a continual source of groundwater and soil contamination.

85. As groundwater passes from east to west, from 790 Greenfield Drive, underneath the school and adjacent MHPs, the passing groundwater is contaminated by TCE and other chlorinated solvents. The contaminated groundwater continues to pollute the soil and groundwater beneath Greenfield, Starlight, and Villa Cajon, including the real property upon which Plaintiffs' trailers are or were situated.

86. New groundwater contamination occurs on a daily basis, and contaminated groundwater newly enters into and beneath the real property upon which Plaintiffs' mobile home trailer is located on a daily, continuing basis.

87. SENIOR OPERATIONS knows and has known, since purchasing 790 Greenfield Drive 20 years ago, that groundwater is continuously contaminated by toxic chemicals underneath and on 790 Greenfield Drive, thereby continuously trespassing and causing a known and continuous nuisance.

88. SENIOR's alleged status under any Prospective Purchaser Agreement with the CRWQCB has no effect or impact as to third party tort victims such as Plaintiff or the putative class.

89. SENIOR does not have a Prospective Purchaser Agreement with the Department of Toxic Substances Control.

90. THOMAS DEENEY, acting within the course and scope of his employment with AMETEK, responsible for decision making and capable of binding AMETEK, between at least 1998 and 2008, did personally and consciously ignore official State of California Cleanup and Abatement Orders, official State of California Notices of Violation, and many letters from the State of California regarding failure to delineate the toxic groundwater plume as a step towards remediation, thereby consciously allowing the plume to continue to grow, thereby causing additional harm.

91. Despite receiving such Cleanup and Abatement Orders, Notices of Violation and letters regarding AMETEK's failure to delineate the plume, DEENEY consciously ignored such correspondence, with knowledge of legal violations and knowledge of a toxic plume, thereby causing additional harm.

92. Despite such knowledge, all Defendants have consciously ignored the continuous release and contamination of groundwater and vapor intrusion. Such willful disregard warrants punitive and exemplary damages.

**<u>Toxic Health Effects</u>**

93. The Agency for Toxic Disease Registry and U.S. Environmental Protection Agency provide information for some of these toxins[30]:

c. TCE: *Affected Organ Systems*: Developmental (effects during periods when organs are developing), Neurological (Nervous System); *Cancer Classification*: NTP: Reasonably Anticipated to be a Human Carcinogen; EPA: Carcinogenic to humans; IARC: Carcinogenic to humans (evidence for cancer is based on kidney cancer, limited evidence for non-Hodgkin lymphoma and liver cancer, as well as, various tumors in animals); *Chemical Classification*: Volatile organic compounds; *Summary:* Trichloroethylene (TCE) is a nonflammable, colorless liquid with a somewhat sweet odor and a sweet, burning taste. It is used mainly

[30] www.atsdr.cdc.gov

as a solvent to remove grease from metal parts, but it is also an ingredient in adhesives, paint removers, typewriter correction fluids, and spot removers. Trichloroethylene is not thought to occur naturally in the environment. However, it has been found in underground water sources and many surface waters as a result of the manufacture, use, and disposal of the chemical.

d. PCE: *Affected Organ Systems:* Developmental (effects during periods when organs are developing), Neurological (Nervous System), Respiratory (From the Nose to the Lungs); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Tetrachloroethylene (PCE) is a manufactured chemical that is widely used for dry cleaning of fabrics and for metal-degreasing. It is also used to make other chemicals and is used in some consumer products.

e. TCA: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Neurological (Nervous System); *Chemical Classification:* Volatile organic compounds; *Summary:* 1,1,1-Trichloroethane is a synthetic chemical that does not occur naturally in the environment. It also is known as methylchloroform, methyltrichloromethane, trichloromethylmethane, and trichloromethane.

f. DCE[31]: *Affected Organ Systems:* Short-term: EPA has found 1,1-DCE to potentially cause the following health effects when people are exposed to it at levels above the MCL for relatively short periods of time: liver damage. Long-term: 1,1-DCE has the potential to cause the following effects from a lifetime exposure at levels above the MCL:

[31] www.epa.gov

liver and kidney damage, as well as toxicity to the developing fetus; cancer; *Summary:* 1,1-DCE will evaporate from soil and will leach into the groundwater where its fate is unknown, but degradation is expected to be slow. Its tendency to accumulate in aquatic life is unknown but expected to be minor.

g. Dioxane: *Affected Organ Systems:* Hepatic (Liver), Ocular (Eyes), Renal (Urinary System or Kidneys); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Summary:* 1,4-Dioxane is a clear liquid that easily dissolves in water. It is used primarily as a solvent in the manufacture of chemicals and as a laboratory reagent; 1,4-dioxane also has various other uses that take advantage of its solvent properties.

h. Vinyl Chloride: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Developmental (effects during periods when organs are developing), Hepatic (Liver), Immunological (Immune System); *Cancer Classification:* NTP: Known to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Vinyl chloride is a colorless gas. It burns easily and it is not stable at high temperatures. It has a mild, sweet odor. It is a manufactured substance that does not occur naturally. It can be formed when other substances such as Trichloroethane (TCA), trichloroethylene (TCE), and tetrachloroethylene (PCE) are broken down. Vinyl chloride is used to make polyvinyl chloride (PVC). PVC is used to make a variety of plastic products, including pipes, wire and cable coatings, and packaging materials. Vinyl chloride is also known as chloroethene, chloroethylene, and ethylene monochloride.

/ / /

/ / /

**Greenfield, Starlight, and Villa Cajon Mobile Home Parks**

94. Greenfield is a mobile home park located due west of the AMETEK PROPERTY. As such, Greenfield is directly west and down-gradient of the AMETEK SUMP.

95. Starlight is a mobile home park located due west-northwest of the AMETEK PROPERTY. As such, Starlight is northwest and down-gradient of the AMETEK SUMP.

96. Villa Cajon is a mobile home park located due west-northwest of the AMETEK PROPERTY. As such Villa Cajon is west-northwest and down-gradient of the AMETEK SUMP.

97. According to AMETEK's own environmental consultants, Environmental Resources Management ("ERM"), the chlorinated solvent plume, including TCE and other chemicals, flows directly underneath Greenfield, Starlight, and Villa Cajon.

98. Groundwater Monitoring Wells (MW) have been placed around the mobile home parks: upgradient, downgradient, north, and south of the mobile homes. TCE concentrations sampled from these groundwater MWs assist in identifying the TCE plume underneath the mobile home parks. Below are examples of TCE concentrations surrounding the mobile home parks:

a. MW-40 in 2016, upgradient of MHPs and adjacent to Starlight: 81,000 ug/L.

b. MW-16 in 2011, upgradient of and adjacent to MHPs: 5,600 ug/L.

c. MW-18 in 2012, downgradient of MHPs: 1,200 ug/L.

d. MW-46B in 2015, upgradient of and adjacent to MHPs: 9,500 ug/L.

e. MW-46C in 2013, upgradient of and adjacent to MHPs: 11,000 ug/L.

99. AMETEK's consultants document groundwater contamination of TCE and other chemicals underneath Greenfield, Starlight, and Villa Cajon.

100. TCE and other chlorinated solvent chemicals at and underneath 790 Greenfield Drive continue to cause groundwater contamination on a daily basis—the

contaminated groundwater flows down-gradient and westward into and beneath Greenfield, Starlight, and Villa Cajon.

101. A continuous groundwater contamination is occurring every day due to a currently constant source of chemicals underneath 790 Greenfield Drive. The current constant source of chemicals underneath 790 Greenfield Drive continuously contaminates the groundwater as it passes westward underneath 790 Greenfield Drive property and into and beneath the real property upon which Plaintiffs' residences are or were located, causing vapor intrusion into Plaintiffs' mobile home crawl space and indoor air.

102. Defendants know and have known that 790 Greenfield Drive, including the subsurface soil, alluvium, decomposed granite, and/or granitic bedrock, are contaminated with TCE and other toxic chemicals. Defendants know and have known that TCE and other toxic chemicals on and beneath 790 Greenfield Drive have been and continue to contaminate the groundwater as it passes through the property's subsurface soils, and then underneath the downgradient mobile home park properties. Despite this knowledge, Defendants have consciously ignored the risk of further contamination and the risk to human health and have chosen not to clean up or remediate the TCE and other toxic chemicals.

**Additional/Special Increased Risk to Children and Pregnant Women**

103. Young children 10 years and younger, like Plaintiff Jordan Yates during the time he lived at Villa Cajon, and pregnant women and their unborn babies, are especially susceptible and vulnerable to toxic exposure and associated risk thresholds are higher for children and pregnant women.

*a.* The U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, published *ATSDR Case Studies in Environmental Medicine, Principles of Pediatric Environmental Health-The Child as Susceptible Host: A Developmental Approach to Pediatric Environmental Medicine, Course: WB2089*, which explains:

1. "Childhood is a time of rapid growth and development. It is accompanied by changes in organ system functioning, metabolic capabilities, physical size, and behavior that can dramatically modify the effects, the illness, or both caused by toxicant exposure. Pediatricians and other clinicians caring for children need to understand these special susceptibilities."
2. "Children may ingest or inhale dirt or dust contaminated with… environmental toxicants during play or other normal activities. Questions could include exposures to indoor air and outdoor air pollutants and contaminated drinking water and soil."
3. "Soil intake ranged from a minimal estimate of 108 milligrams (mg)/day to a maximum of 1,834 mg/day of soil…."
4. "Children usually have increased exposures per kilogram of body weight, compared to adults."
5. "Children's dynamic growth and development puts them at increased risk from environmental toxicants."
6. "Special consideration must be given to toxic exposures during fetal life, infancy, childhood, and adolescence."
7. "Because children grow and develop, they have a higher metabolic rate and thus have a greater need for oxygen….. Children breathe more air… per kilogram of body weight than do adults. These result in greater exposures per kilogram of body weight to any contaminants in the air…."
8. "Children have an increased surface area-to-body mass ratio (in infants and young children) resulting in an increased risk of dermal exposure and absorption."

9. "Children's long life expectancy increases their risk of adverse outcomes (e.g., cancer, renal or liver failure, senility) from exposures to those toxicants whose effects are expressed after a long latency period."
10. "The rapid development of organ systems during embryonic, fetal, infant, and early childhood periods make children vulnerable when exposed to environmental toxicants."
11. "Parental exposures before a child is conceived can result in adverse reproductive effects, including Infertility, Spontaneous abortion, and Genetic damage to the fetus, possibly resulting in birth defects."
12. "Exposures to hazardous substances during pregnancy can potentially affect the development of fetal organ systems."
13. "Exposures can cause profound systemic damage out of proportion with the dose response seen in adults."
14. "A fact of fetal life is that the fetus cannot escape transplacental transport of toxicants to which the mother is exposed."

**CACI 3903 B - Medical Monitoring- Toxic Exposure (Economic Damages)**

104. As a result of the above mentioned toxic exposure, the need for future medical monitoring is reasonably certain, and Plaintiffs, on behalf of themselves and the entire putative class, seek reasonable monitoring.

105. The significance and extent of the class' exposure to the chemicals is extensive because residents were exposed for many hours per day and night, and for many years while living in the mobile homes exposed to toxic vapor intrusion.

106. As described above, and documented by the ASTDR and the EPA, the subject chemicals are very toxic and can cause cancer, and/or liver, kidney, respiratory, neurological, developmental, and other diseases and illnesses.

107. Due to the indoor air intrusion of these toxic chemicals, there is a significantly increased risk to the class members, both current and former residents and/or owners of the mobile home units within the subject MHPs, of developing the above mentioned diseases as a result of the exposure when compared to their chances of developing those diseases had they not been exposed and when compared to the chances that members of the public at large will develop the diseases.

108. The seriousness of the diseases can be as grave as cancer and organ disease, and can be extremely painful and/or deadly.

109. The class will receive a significant medical benefit from early detection and diagnosis because early detection of cancer and organ disease can help doctors treat class members and hopefully prevent grave or very serious outcomes, such as late stage cancers, organ failure, and potentially death.

## First Cause of Action

## Negligence

## (Against All Defendants)

110. Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 110.

111. Plaintiffs were and continue to be harmed by Defendants' negligent conduct as described above.

112. Plaintiffs were and continue to be harmed by Defendants' negligent conduct because Plaintiffs are current and former residents of the MHPs and have been exposed to toxic vapors, and the mobile home units where Plaintiffs currently or formerly reside are, have been, and continue to be subject to vapor intrusion and exposure, causing economic losses.

113. Defendants' negligent conduct was a substantial factor in causing Plaintiffs' harm.

114. Defendants' above-described conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

**<u>Second Cause of Action</u>**

**Gross Negligence**

**(Against All Defendants)**

115. Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 115.

116. Plaintiffs were harmed by Defendants' negligent conduct as described above.

117. Plaintiffs were and continue to be harmed by Defendants' negligent conduct because Plaintiffs are current and former residents of the MHPs and have been exposed to toxic vapors, and the mobile home units where Plaintiffs currently or formerly reside are, have been, and continue to be subjected to vapor intrusion and exposure, causing economic damages.

118. Defendants' negligent conduct was a substantial factor in causing Plaintiffs' harm.

119. Defendants' negligent conduct lacked any care whatsoever and was an extreme departure from what reasonably careful companies would do.

120. Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

**<u>Third Cause of Action</u>**

**Public Nuisance**

**(Against All Defendants)**

121. Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 121.

122. Plaintiffs suffered harm because Defendants created a nuisance, which is a continuing nuisance.

123. Defendants, by acting and failing to act, created and/or failed to prevent the toxic chemical contamination, a condition that was and is harmful to health, and

indecent and offensive to the senses, and an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life.

124. The toxic chemical contamination and exposure has affected a substantial number of people at the same time.

125. An ordinary person would be reasonably annoyed or disturbed by the toxic chemical contamination and exposure.

126. The seriousness of the harm outweighs the social utility of Defendants' conduct.

127. Plaintiffs did not consent to Defendants' conduct.

128. Plaintiffs suffered and continue to suffer harm different from the type of harm suffered by the general public because they are, have been and continue to be exposed to toxic vapors and the mobile home units where Plaintiffs currently or formerly reside are, have been and continue to be exposed to toxic vapors.

129. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

130. Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## <u>Fourth Cause of Action</u>

## Private Nuisance

## (Against All Defendants)

131. Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 131.

132. Defendants interfered with Plaintiffs' use and enjoyment of their mobile home property.

133. Defendants, by acting and/or failing to act, created and/or failed to prevent toxic chemical contamination, a condition a condition that is harmful to health, indecent and/or offensive to the senses, and is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and/or property.

/ / /

134. This toxic chemical contamination is a condition that interfered with Plaintiffs' use and enjoyment of their property.

135. The above-described nuisance is a continuing nuisance.

136. Plaintiffs did not consent to Defendants' conduct.

137. An ordinary person would be reasonably annoyed or disturbed by Defendants' conduct.

138. Plaintiff is and continues to be harmed because he has been exposed to toxic vapors and his mobile home is exposed to toxic vapors, causing economic loss.

139. Defendants' conduct was a substantial factor in causing Plaintiff's harm.

140. The seriousness of the harm outweighs the public benefit of Defendants' conduct.

141. Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## Fifth Cause of Action

### Trespass

### (Against All Defendants)

142. Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 142.

143. Defendants trespassed on Plaintiffs' property.

144. Defendants intentionally, recklessly, and negligently entered Plaintiffs' property by intentionally, recklessly, and negligently causing and/or allowing toxic vapors to enter the crawl space and indoor air of Plaintiffs' mobile homes.

145. Plaintiffs did not give permission for the entry.

146. The trespass is a continuing trespass.

147. Plaintiffs were and continue to be harmed because their mobile homes are and have been exposed to toxic vapors causing economic loss, and Plaintiffs have been exposed to toxic vapors.

148. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

149. Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

**DELAYED DISCOVERY AND EQUITABLE TOLLING**

150. At all times relevant herein, Defendants concealed relevant facts that would have allowed Plaintiffs to discover the true nature and degree of the waste dumping, groundwater contamination, soil contamination, and vapor intrusion. As a result of these concealments and misrepresentations, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiffs. Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiffs with respect to the true nature, quality, and hazards of use of the waste dumping, groundwater contamination, and vapor intrusion as described herein and above.

151. Plaintiffs exercised due diligence to discover Defendants' wrongdoing. However, such wrongdoing and/or the full extent and degree of such wrongdoing was not reasonably discoverable prior to the date of the filing of this action and/or prior to two years prior to the filing of this action since Defendants concealed their wrongdoing through misrepresentation, concealment, and failure to disclose. Plaintiffs exercised due diligence by promptly filing this Complaint after discovering the facts giving rise to these claims.

152. Plaintiffs did not discover toxic vapor intrusion until very recently, in March 2017, and certainly within the past two years, only after the California Regional Water Quality Control Board released results of indoor air and crawl space vapor testing, which occurred in February 2017.

**CLASS ACTION ALLEGATIONS**

153. Plaintiffs and the members of the Class have all suffered injury in fact as a result of the exposure to harmful toxins to their person and their property, which was the result of Defendants' unlawful, intentional, and grossly negligent conduct.

154. The "Class Period" includes from 1963 to the date of the filing of this action.

155. Plaintiffs brings this lawsuit on behalf of themselves and all others who resided in or owned a mobile home at Greenfield, Starlight, and/or Villa Cajon, who are similarly situated under Rule 23. Subject to additional information obtained through further investigation and/or discovery, the proposed "Class" consists of the following:

"All persons who have resided or do now reside, and/or all persons who have owned or do now own a mobile home, situated above the contaminated groundwater plume, at Greenfield, Villa Cajon, and/or Starlight mobile home parks."

Excluded from the putative class are Defendants and their officers, directors, and employees. Plaintiffs reserve the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

156. **Ascertainability.** The members of the Class are readily ascertainable by resort to mobile home park records, as well as through public notice.

157. **Numerosity.** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and on that basis alleges, that the proposed Class contains thousands of members.

158. **Existence and predominance of Common Questions of Law and Fact.** Common questions of law and fact that exist as to all members of the Class predominate over any questions affecting only individual class members. All members of the Class have been subject to the same conduct and exposure. The common legal and factual questions include, but are not limited to, the following:

a. Whether Defendants dumped toxic waste into a SUMP;

b. Whether toxic waste escaped the SUMP and percolated into the groundwater beneath the subject properties;

c. Whether the subject toxic waste caused vapor intrusion into mobile homes;

d. Whether residents were exposed to toxic vapors while residing at the subject mobile homes;

e. Whether the contamination is continuing;

f. Whether Defendants' conduct was negligent and/or grossly negligent;

g. Whether Defendants' conduct was intentional;

h. Whether Defendants should be liable for medical monitoring costs;

i. Whether Defendants should be liable for compensatory damages.

159. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs are members of the Class that Plaintiffs seeks to represent. Plaintiffs, like members of the proposed Class, were exposed to toxic vapor intrusion as residents and/or owners of mobile homes in the subject mobile home parks. Defendants have no defenses unique to Plaintiffs.

160. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in environmental, mass, and class actions. Plaintiffs have no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class. Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiffs and proposed Class.

161. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by

Defendants' conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable under Civil Code section 382.

162. Unless a class is certified, Defendants will escape liability for decades-long exposure of toxic chemicals to innocent residents and property owners. Unless class-wide damages and/or a medical monitoring program is ordered as compensation and as a deterrent, Plaintiffs and class members cannot be rightly compensated for the harms caused by the vapor intrusion.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants, and each of them, and that Plaintiffs be awarded relief and damages under all causes of action, from Defendants, and each of them, as follows:

a. Certify the Class as requested herein;
b. Under all Causes of Action as allowable by law, compensatory damages;
c. Under all Causes of Action as allowable by law, costs to abate and/or mitigate the continuing nuisance;
d. Under all Causes of Action as allowable by law, medical monitoring damages.
e. Under all Causes of Action as allowable by law, damages based on diminution of value of property;
f. Punitive damages;
g. Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and as

applicable, to prevent Defendants from retaining the benefits of their wrongful conduct;

h. Statutory post-judgment interest allowable by law;

i. Costs of this suit allowable by law;

j. Reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, as allowed by law; and,

k. Awarding any and all other relief that this Court deems necessary or appropriate.

DATED: May 23, 2017

Respectfully Submitted,

By: s/ John P. Fiske
John P. Fiske

**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
John P. Fiske (SBN 249256)
Celeste Evangelisti (SBN 225232)
Jason Julius (SBN 249036)
603 Coast Hwy, Suite G
Solana Beach, California 92075
Telephone: (214) 521-3605
Fiske@BaronBudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Deborah Dixon (SBN 248965)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
DDixon@GomezTrialAttorneys.com

Attorneys for Plaintiffs

**Trial by Jury**

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

DATED: May 23, 2017 Respectfully Submitted,

By: s/ John P. Fiske
John P. Fiske

**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
John P. Fiske (SBN 249256)
Celeste Evangelisti (SBN 225232)
Jason Julius (SBN 249036)
603 Coast Hwy, Suite G
Solana Beach, California 92075
Telephone: (214) 521-3605
Fiske@BaronBudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Deborah Dixon (SBN 248965)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
DDixon@GomezTrialAttorneys.com

Attorneys for Plaintiffs