UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM COX, individually, by and through his durable power of attorney, VICTOR COX, and on behalf of himself and others similarly situated; MARIA OVERTON, individually and on behalf of herself and others similarly situated; JORDAN YATES, individually and on behalf of himself and others similarly situated,, | Case No.: 3:17-cv-00597-GPC-AGS **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS** **[ECF Nos. 31, 32, 45, and 46]** |
| Plaintiffs, | |
| v. | |
| AMETEK, INC.; THOMAS DEENEY; SENIOR OPERATIONS LLC; and DOES 1 through 100, inclusive,, | |
| Defendants. | |
| AMETEK, INC.; and THOMAS DEENEY; | |
| Third-Party Plaintiffs, | |
| GREENFIELD MHP ASSOCIATES, L.P.; KORT & SCOTT FINANCIAL GROUP, LLC; TUSTIN RANCH | |

1

PARTNERS, INC.; SIERRA
CORPORATE MANAGEMENT, INC.;
VILLA CAJON MHC, L.P.; KMC CA
MANAGEMENT, LLC; KINGSLEY
MANAGEMENT CORP.; STARLIGHT
MHP, LLC; and ROES 1-100, inclusive,

                    Third-Party Defendants.

SENIOR OPERATIONS, LLC,

                    Third-Party Plaintiff,

GREENFIELD MHP ASSOCIATES,
L.P.; KORT & SCOTT FINANCIAL
GROUP, LLC; TUSTIN RANCH
PARTNERS, INC.; SIERRA
CORPORATE MANAGEMENT, INC.;
VILLA CAJON MHC, L.P.; KMC CA
MANAGEMENT, LLC; KINGSLEY
MANAGEMENT CORP.; STARLIGHT
MHP, LLC; ROES 101-200, inclusive,

                    Third-Party Defendants.

Before the Court are four motions to dismiss filed by the third-party defendants (the "TPDs") in this case. Two were filed by Third-Party Defendants KMC CA Management, LLC ("KMC"); Kingsley Management Corp. ("Kingsley"); and Villa Cajon MHC, L.P. ("Villa Cajon"), who seek dismissal of the third-party complaints filed against them by Defendant/Third-Party Plaintiff Senior Operations ("Senior"), LLC (ECF No. 31), and Defendants/Third-Party Plaintiffs Ametek, Inc. ("Ametek"), and Thomas Deeney (ECF No. 32). The other two motions to dismiss were filed by Third-Party Defendants Greenfield MHP Associates ("Greenfield"); Starlight MHP, LLC ("Starlight"); Kort & Scott Financial Group, LLC ("K&S"); Tustin Ranch Partners, Inc.

2

("Tustin"); and Sierra Corporate Management, Inc. ("Sierra"), who also seek dismissal of the third-party complaints filed against them by Ametek and Deeney (ECF No. 45) and Senior (ECF No. 46). All four motions have been fully briefed by the appropriate parties. The Court refers to the third-party plaintiffs in this case—Ametek, Deeney, and Senior—as the "TPPs."

Based upon a review of the moving papers, the applicable law, and for the foregoing reasons, the Court hereby **GRANTS in part and DENIES in part** the motions to dismiss. The motions are denied in all respects except for the TPPs' claim for attorneys' fees under California law, which are dismissed.

## I.      Background

Plaintiffs in this case—individuals who previously lived or currently live in three mobile home parks owned and/or operated by the TPDs—filed this action on March 24, 2017, against Ametek, Deeney, and Senior. (ECF No. 1.) Plaintiffs' operative Amended Complaint alleges that Ametek, Deeney, and Senior caused and/or failed to mitigate the contamination of groundwater and subsurface soil in and around the mobile home parks by toxic waste originating from an aerospace equipment manufacturing facility owned by Ametek, and later Senior. (*See* ECF No. 5.) This case is one of four related cases currently pending before the Court relating to this alleged contamination. *See also Trujillo, et al. v. Ametek, Inc., et al.*, No. 3:15-cv-01394-GPC-AGS; *Greenfield MHP Assocs. v. Ametek, Inc., et al., L.P.*, No. 3:15-cv-01525-GPC-AGS; *Cox, et al. v. Ametek, Inc., et al.*, No. 3:17-cv-01211-GPC-AGS.

## II.      The Third-Party Complaints

On June 20, 2017, Senior filed a third-party complaint against the TPDs. (ECF No. 12.) Ametek and Deeney did the same on June 27, 2017. (ECF No. 14.) Both third-party complaints assert that the TPDs are at least partially liable for Plaintiffs' damages because the TPDs knowingly withheld information about the contamination from Plaintiffs when executing rental agreements. The third-party complaints group the TPDs based on alleged past and present ownership interests in the three mobile home parks at

issue in this case; they refer to the "Greenfield TPDs" (Greenfield, K&S, Tustin, and Sierra), the "Villa Cajon TPDs" (Villa Cajon, KMC, and Kingsley), and the "Starlight TPDs" (Starlight, Sierra, K&S, and Tustin). (*See* ECF Nos. 12 at 2–3; 14 at 2–4.)

The TPPs allege that one or more of the Greenfield TPDs has managed the Greenfield mobile home park since 1993, and have owned it since June 2004; one or more of the Villa Cajon TPDs has owned the Villa Cajon mobile home park since late 2009 or early 2010; and one or more of the Starlight TPDs has owned and operated the Starlight mobile home park since May 2015. (ECF Nos. 12 at 7–9; 14 at 7–9.) As a result of public notices by the State of California and/or the TPDs' due diligence during their acquisition of these properties, the third-party complaints allege, the TPDs were or should have been aware of "the environmental conditions" impacting the three mobile home parks. (*Id.*) The TPPs allege that the TPDs were on actual, constructive, or inquiry notice of the contamination originating from the TPPs' facility, information about which would have been found in the records of the San Diego County Department of Health, the San Diego Regional Water Quality Control Board, or the California Department of Toxic Substances Control. (ECF Nos. 12 at 9–12; 14 at 9–12.) The TPPs also allege that, despite the fact that the TPDs brought suit against the TPPs in 2015 over the contamination of their properties, the TPDs did not disclose this lawsuit to their residents for approximately a year and a half. (ECF Nos. 12 at 12–13; 14 at 12–14.) As a result, the TPPs claim, the TPDs violated their duties "to deal honestly with Plaintiffs, and those similarly situated, in negotiating lease agreements and disclosing information or concerns which residents of their respective Parks would find material in deciding to live at such Parks." (ECF Nos. 12 at 13; 14 at 13.)

The TPPs' third-party complaints assert claims of (1) equitable indemnity, (2) comparative indemnity, and (3) declaratory relief, and seek attorneys' fees. (*See* ECF Nos. 12 at 14–17; 14 at 14–17.)

### III. Legal Standards

The TPDs move to dismiss the TPPs' claims under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).

A motion under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction to adjudicate a particular claim. "An attack on subject matter jurisdiction may be facial or factual. 'In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'" *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). The TPDs' jurisdictional challenge here is facial; they offer no evidence to prove that the allegations in the third-party complaint relevant to the Court's jurisdiction are not true, and—as discussed further below—they contend generally that a party in the TPPs' position may not assert a claim against the TPDs. Because "[t]he district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)," *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014), the Court applies the legal standard appropriate for a Rule 12(b)(6) motion to the TPPs' jurisdictional challenge.

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

**IV.  Discussion**

"Equitable indemnity allows one tortfeasor to seek either full or partial indemnity

from a joint tortfeasor on a comparative fault basis."  *San Diego Unified Port Dist. v. Monsanto Co.*, No. 15-cv-578-WQH-JLB, 2016 WL 5464551, at *9 (S.D. Cal. Sept. 28, 2016).  The TPDs argue that the TPPs cannot seek such indemnity from the TPDs because (1) the TPPs lack standing to bring such a claim, and (2) the third-party complaints do not allege facts stating a plausible claim for indemnification.

### a.  Standing

The TPDs contend that the TPPs lack standing to assert their third-party claims because the TPPs have not been harmed by the TPDs' conduct.  (ECF Nos. 31-1 at 5–6; 32-1 at 5–6; 45-1 at 4–5; 46-1 at 4–5.)  The Court disagrees.

The TPDs' claims are prototypical contribution actions envisioned by Federal Rule of Civil Procedure 14(a).  That rule permits a defendant to bring a third-party action against "a nonparty who is *or may be liable* to it for all or part of the claim against it."  Fed. R. Civ. P. 14(a) (emphasis added).  The TPDs, according to the third-party complaints, may be liable to the TPPs for at least some of the damages sought by Plaintiffs.  Courts in this district have rejected similar jurisdictional challenges to impleader actions under Rule 14(a) premised on the theory that the defendant/third-party plaintiff has not yet been injured by the third-party defendant.  *See, e.g.*, *Hallam v. Gemini Ins. Co.*, No. 12-cv-2442-CAB-JLB, 2015 WL 11237479, at *2–4 (S.D. Cal. Apr. 8, 2015); *Kormylo v. Forever Resorts, LLC*, No. 13-cv-511-JM-WVG, 2015 WL 106379, *4–5 (S.D. Cal. Jan. 6, 2015).  As those orders' analyses suggest, a third-party plaintiff's injury in this situation is essentially imminent; if it is held liable to the original plaintiff for full damages, and the third-party defendant could also be liable to the plaintiff for some extent for the same damages, the third-party plaintiff will incur an injury and will be entitled to contribution from the third-party defendant.[1]

---

[1] While the third-party defendants in the cases cited above challenged the Court's jurisdiction on ripeness grounds, the same reasoning applies in the standing context: "[t]he constitutional component [of ripeness] overlaps with the 'injury in fact' analysis for Article III standing."  *Kormylo*, 2015 WL 106379, at *4 (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010)).

The court's order in *Hallam* offers a cogent explanation for why this Court may address Plaintiffs' claims and the TPPs' third-party claims concurrently:

> To dismiss [the third-party plaintiff's] claims here for lack of subject-matter jurisdiction would contravene the purpose of Rule 14, which is to promote judicial efficiency by eliminating the necessity for the defendant to bring a separate action against a third individual who may be secondarily or derivatively liable to the defendant for all or part of the plaintiff's original claim. . . . Dismissing these claims now, only to later require [the third-party plaintiff] to open a new case, re-serve the same third-party defendants, and obtain responses from third-party defendants, would be wasteful.

2015 WL 11237479, at *3 (citation and internal quotation marks omitted). For the same reasons, the Court finds that it possesses subject matter jurisdiction over TPPs' third-party claims against the TPDs. According to the third-party complaints, the TPPs are under the threat of liability to the Plaintiffs in this case. In light of the joint-and-several nature of California economic damages, *see* Cal. Civ. Code § 1431, if Plaintiffs succeed, the TPPs will be forced to pay an amount for which the TPDs, not the TPPs, may be legally responsible. That creates a "substantial risk that harm will occur," which is sufficient to satisfy the constitutional requirement of injury-in-fact. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014). The Court also notes that if this situation did not confer standing on the third-party plaintiff, no third-party claim under Rule 14 could ever go forward prior to an issuance of judgment against the third-party plaintiff in the original suit.

The TPDs also contend that the TPPs lack standing to assert their claims against the TPDs because the TPPs are not entitled to contribution from TPDs. But that is not an issue of standing; rather, it is a matter of the substantive merit of the TPPs' third-party claims. The Court turns to that issue next.

### b. Merits

#### i. The TPDs' Status as "Victims" of the TPPs' Tort

The Villa Cajon TPDs contend that the TPPs cannot seek equitable indemnity because "[a] defendant has no cause of action for equitable indemnity against the victim

of his own tort." *Seamen's Bank for Savings v. Superior Ct.*, 236 Cal. Rptr. 31, 34–36 (Cal. Ct. App. 1987). They point to the fact that they have brought their own suit against the TPPs as a result of the TPDs' contamination of the mobile park properties. *See Greenfield MHP Assocs., L.P., et al. v. Ametek, Inc., et al.*, No. 3:15-cv-01525 (S.D. Cal.) (the "*Greenfield* Suit"). Because they are the victims of the same tort that the TPPs allegedly committed against the Plaintiffs in this case, the Villa Cajon TPDs argue, *Seamen's* "victim bar" prohibits the TPPs' equitable indemnity claim.

In *Seamen's*, Bank of America brought suit against its own employees for losses resulting from a settlement it executed with investors over the bank's involvement in fraudulent mortgage pass-through certificates. *Id.* at 1488. The bank claimed that the employees breached their duties when acting as escrow and trust officers overseeing the certificate transactions. *Id.* at 1489. The employees cross-claimed against the investors and sought equitable indemnity, asserting that the investors breached a duty owed to the bank to "act prudently" as investors. *Id.* at 1490. The Court of Appeal held that the equitable indemnity claim must be dismissed because the investors (1) owed no duty to the bank, and (2) were victims of the employees' own tort. *Id.* at 1491–93.

*Seamen's*, however, is inapplicable here. First, the TPDs owed duties to Plaintiffs to inform them of a "hidden defect in the premises, or danger thereon, which is known to the lessor at the time of making the lease." *Merrill v. Buck*, 375 P.2d 304, 557 (Cal. 1962). Second, the TPDs in this case are not just victims of the TPPs tort; they are also tortfeasors. These differences make this case quite similar to *Riverhead Sav. Bank v. Nat'l Mortg. Equity Corp.*, 893 F.2d 1109 (9th Cir. 1990). There, plaintiffs sued NMEC, asserting that NMEC had fraudulently packaged the same mortgage certificates at issue in *Seamen's*. *Id.* at 111. One of the plaintiffs had purchased one of the certificates from Umpqua, and NMEC filed a third-party claim against Umpqua and sought equitable indemnity. *Id.* Analogizing to *Seamen's*, the district court dismissed NMEC's claim against Umpqua because it found that Umpqua was a "victim" of NMEC's tort. *Id.* at 1111–12. The district court also entered sanctions against NMEC for filing a frivolous

claim. *Id.* The Court of Appeals reversed. It explained that *Seamen's* victim bar does not apply when an equitable indemnity claim is pursued "against one who is a concurrent tortfeasor against a third party and whose asserted liability is based on actions or inactions other than susceptibility to the would-be indemnitee's own tort." *Id.* at 1117. In other words, if the would-be indemnitor is just a victim, no equitable indemnity action may proceed; if the would-be indemnitor is a victim *and* a tortfeasor to the plaintiff, an equitable indemnity action may proceed.

Here, the Court is faced with the latter scenario. While the TPDs may well be victims of the TPPs' conduct, the allegations in the third-party complaints suggest that the TPDs are also tortfeasors to Plaintiffs by failing to disclose the existence of a dangerous condition on their property. The *Seamen's* rule does not bar the TPPs from bringing an equitable indemnification action against the TPDs.

### ii. Whether the TPPs and TPDs are Joint Tortfeasors

Next, the Villa Cajon TPDs argue that the TPPs cannot seek equitable indemnity from them because the TPPs and TPDs were not joint tortfeasors as to Plaintiffs. *See Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Group*, 49 Cal. Rptr. 3d 609, 1040 (Cal. Ct. App. 2006) ("It is well-settled in California that equitable indemnity is only available among *tortfeasors* who are jointly and severally liable for the plaintiff's injury."). The Court disagrees. Taking the facts alleged in the third-party complaints to be true, the TPPs and TPDs are joint tortfeasors under California law.

The parties present the Court with two different definitions of "joint tortfeasor" under California law. The Villa Cajon TPDs argue that parties are not joint tortfeasors unless they act in concert and violate a "joint legal obligation" to the victim of their torts. The TPPs, by contrast, argue that California courts have rejected this "narrow interpretation," and do not require that the parties act in concert or violate the same duty. The Court finds that the TPPs' interpretation to be correct.

The starting point in the relevant case law is *Commercial Std. Title Co. v. Superior Ct.*, 155 Cal. Rptr. 393 (1979). There, the plaintiff sued multiple title companies after it

was discovered that the title companies failed to disclose a trust deed on property purchased by the plaintiff. *Id.* at 395–96. The trial court denied the title companies leave to seek partial indemnity from the plaintiff's attorney who executed the land purchase by asserting that the attorney was negligent in handling the transaction. *Id.* The Court of Appeal affirmed. In doing so, the court first acknowledged that the Supreme Court of California had recently recognized that "under the common law equitable indemnity doctrine a concurrent tortfeasor may obtain partial indemnity from cotortfeasors on a comparative fault basis." *Am. Motorcycle Ass'n v. Superior Ct.*, 578 P.2d 899, 918 (Cal. 1978). Noting that this rule is "riddled with exceptions," however, the *Commercial Standard* court held that it is necessary to examine the facts of each case to determine whether indemnity could be appropriate. 155 Cal. Rptr. at 398. With respect to the facts of the case before it, the court concluded that the plaintiff's attorney did not share the "essential characteristic of a joint tortfeasor" because "he is not [r]esponsible for the entire damage when he is joined as a joint tortfeasor with his client's legal opponent." *Id.* at 398–99. The court held that the attorney's liability to the plaintiff "proceeds from a totally difference source, factually and legally, from that of his client's opponent," and had not acted "in 'concert' with the opposition to produce the injuries to his client." *Id.* at 399. But "the most disturbing aspect of the Title Companies' pleadings," the court explained, was their assertion that the attorney was negligent because he relied on the title companies' honesty. *Id.* at 400. According to the court, public policy could not permit such a claim. *Id.*

The *Commercial Standard* opinion can reasonably be interpreted to mean that equitable indemnity may not be obtained if the indemnitor (1) cannot be held liable for all of the damages Plaintiff seeks from the indemnitee, (2) the indemnitor did not act in concert with the indemnitee, or (3) the indemnitor and indemnitee breached different duties to the plaintiff. Here, under such an interpretation of *Commercial Standard*, the TPPs would not be able to obtain indemnity from the TPDs because they violated different duties to Plaintiffs.

California courts, however, have since rejected this interpretation of *Commercial Standard* as defining "joint tortfeasor" for purposes of equitable indemnity too narrowly. For example, in *Considine Co. v. Shadle, Hunt & Hagar*, 232 Cal. Rptr. 250 (Cal. Ct. App. 1986), the Court of Appeal held that a commercial property lessor could seek indemnity from a law firm for damages claimed by a lessee, when the law firm allegedly committed malpractice during its representation of both the lessor and lessee in a related legal dispute brought by a different lessee on the property. Relying on *Commercial Standard*, the law firm argued no indemnity action could be pursued against it because the lessor and the law firm did not act in concert, and they shared no joint duty to the lessee. *Id.* at 254. The court rejected this narrow interpretation of *Commercial Standard*, and explained that "the term 'joint tortfeasors' . . . [is not] limited to those who act in concert to cause an injury." *Id.* Rather, the meaning of joint tortfeasor "had been expanded to include joint, concurrent and successive tortfeasors." *Id.*

Other courts have recognized this "expansion" of the definition of a tortfeasor for purposes of equitable indemnity. *See, e.g.*, *BFGC Architects Planners, Inc. v. Forum/Mackey Constr., Inc.*, 14 Cal. Rprt. 3d 721, 724 (Cal. Ct. App. 2004) ("[J]oint and several liability in the context of equitable indemnity is fairly expansive. We agree it is not limited to the old common term joint tortfeasor. It can apply to acts that are concurrent or successive, joint or several, as long as they create a detriment caused by several actors." (internal quotation marks and omissions omitted)); *Willdan v. Sialic Contractors Corp.*, 69 Cal. Rptr. 3d 633, 639 (Cal. Ct. App. 2007) ("It is not significant in this regard that [the indemnitor and indemnitee] may not have acted in concert and, therefore are not 'joint tortfeasors' in the classic sense of that term: The doctrine of comparative equitable indemnity is available to apportion liability among wrongdoers based on their relative culpability provided only that the actions of the parties combined to create an indivisible injury to the plaintiff."); *Newhall Land & Farming Co. v. McCarthy Constr.*, 106 Cal. Rptr. 2d 10, 13 (Cal. Ct. App. 2001) (same); *Gem Developers v. Hallcraft Homes of San Diego, Inc.*, 261 Cal. Rptr. 626, 632 (Cal. Ct. App.

1989) (same).

The cases cited by the Villa Cajon TPDs do not offer any serious response to this conclusion. In *Monsanto*, the San Diego Port District pursued, *inter alia*, an equitable indemnity action against Monsanto after the Port District was named in a "Cleanup and Abatement Order" by a regional water board. 2016 WL 5464551, at *9. Without much explanation, the court dismissed the indemnity action because the allegations in the Port District's complaint did not demonstrate that Monsanto "could be jointly liable to the" water board. *Id.* at *10. It cited *Sullins v. Exxon/Mobile Corp.*, 729 F. Supp. 2d 1129, 1140 (N.D. Cal. 2010), which granted summary judgment on an equitable indemnity claim because "a final cleanup order from a regulatory agency was not a money judgment or settlement." *Monsanto*, 2016 WL 5464551, at *10. That makes *Monsanto* unlike this case, in which the TPDs face the prospect of a money judgment.[2]

Nor does *Energy 2001 v. Pac. Ins. Co.*, No. 2L10-cv-415-JAM-KJN, 2011 WL 837124 (E.D. Cal. Mar. 8, 2011), support the TPDs' interpretation of "joint tortfeasor." There, a power plant owner sued a group of insurance companies after the plant was damaged. *Id.* at *1. One of the insurance companies cross-claimed against another insurance company, Lexington, which had been previously granted summary judgment in the same case. *Id.* Because the court had previously concluded that the Lexington "owed no contractual duty" to the plaintiff, the court dismissed the cross-claim. *Id.* at *3. As the court explained, "in order for Cross-Claimants to maintain their cross claims against

---

[2] The *Monsanto* court also appears to have relied on the fact that California courts require that a judgment or settlement have been actually rendered against the indemnitee before it can bring an indemnity action against a joint tortfeasor. *Id.* (citing *Sullins v. Exxon/Mobile Corp.*, 729 F. Supp. 2d 1129, 1140 (N.D. Cal. 2010). The Court disagrees with that analysis, and joins those courts in this district that have concluded that Federal Rule of Civil Procedure 14(a) permits an indemnity action to be brought in federal court before judgment is issued against the indemnitee in the underlying case so long as the indemnitee's allegations establish that the joint tortfeasor may also be liable to the plaintiff. *See, e.g.*, *Kormylo*, 2015 WL 106379, at *4–5 ("The court . . . concludes that the indemnity claims against the [third-party defendant] are sufficiently ripe for adjudication because they were brought pursuant to Federal Rule of Civil Procedure 14(a), although they have not yet accrued under California law."); *Hallam*, 2015 WL 11237479, at *3.

Lexington, there must exist a legal obligation, or duty, that Lexington owes to" the plant owner. *Id.* And because the court had already determined that Lexington owed no duty to the plaintiff, the court concluded that no indemnity action could be pursued against Lexington. *Id.* In this respect, *Energy 2001* differs from the situation in this case, where the TPDs did have a duty to Plaintiffs.

Finally, the Villa Cajon TPDs cite *Ironwood Homes, Inc. v. Bowen*, 719 F. Supp. 2d 1277, 1294 (D. Or. 2010). That case offers no help to the TPDs because there, the court applied Oregon law, not California law.

*Munoz v. Davis*, 190 Cal. Rptr. 400 (Cal. Ct. App. 1983)—cited by the Greenfield and Starlight TPDs—also fails to indicate that the narrow interpretation of *Commercial Standard* applies here. In *Munoz*, a victim of a car collision sued his attorney, Munoz, as a result of Munoz's failure to file a timely complaint against the driver of the other vehicle, Davis. *Id.* at 401. Munoz filed an equitable indemnity crossclaim against Davis, alleging that Davis was also liable to the plaintiff as a result of Davis's negligent driving. The Court of Appeal affirmed the dismissal of Munoz's cross-claim. *Id.* at 402. The court explained that Davis's duty to the plaintiff was unlike Munoz's duty: "[Munoz's] argument assumes that Davis owed a duty to [the plaintiff] to insure that his legal claims were being competently prosecuted[, but] we find no basis for imposing such a duty." *Id.* at 404. The court proceeded, however, to explain that this analysis was "essentially a question of whether the *policy of the law* will extend the responsibility for the conduct to the consequences which have in fact occurred"; in *Munoz*, that question was, "should the court turn negligent drivers into a new class of attorney malpractice insurers?" *Id.* (emphasis added). Unsurprisingly, the court's answer was no. *Id.* The court distinguished the facts before it from cases in which negligent drivers were held liable for subsequent medical malpractice, explaining that "medical treatment is closely and reasonably associated with the immediate consequences" of the negligent driving. *Id.* at 404–05. By contrast, the court stated, the nexus between Davis's conduct "and the risk of injury that ultimately occurred to [the plaintiff] is too tenuous to support the imposition of

a duty on Davis." *Id.* at 405. In other words, the injury that plaintiff incurred "as a result of Munoz' negligence—loss of a right of action—is entirely distinct from the injury that was the immediate consequence of Davis' negligence—physical injuries—and does not form a normal part of the aftermath of careless driving." *Id.* The court also explained that forcing a duty on Davis to ensure that Munoz reasonably performed his duties as an attorney would be unworkable—"the negligent motorist would have to sit at the very elbow of his adversary's counsel and have unrestrained access to their communications." *Id.*

The *Munoz* court's explanation of why Davis and Munoz were not joint tortfeasors indicates exactly why the TPDs and TPPs *would* be considered joint tortfeasors in this case. The harm Plaintiffs incurred as a result of the TPPs' and TPDs' actions is the same: health detriments as a result of inhaling toxic vapors. And whereas a driver's duty to others on the road cannot be reasonably held to extend to ensuring that other drivers' attorney adequately performs her job, a landlord aware of dangerous and toxic contaminants in his land caused by a neighbor has a related duty to inform lessees of that dangerous defect.

In sum, assuming the truth of the allegations in the third-party complaints—that is, that the TPDs breached a duty to warn Plaintiffs about the existence of dangerous contaminants in the soil of mobile home parks—the TPDs and TPPs are joint tortfeasors for purposes of an equitable indemnity claim.

### iii. Whether Equity Permits Indemnity

Based on the discussion above, it appears that the proper view of *Commercial Standard* is that when asked to permit an equitable indemnity claim, the court must ask whether it would be unfair or contrary to public policy to permit indemnity under the facts of the case. *See, e.g.*, *W. Steamship Lines, Inc. v. San Pedro Peninsula Hosp.*, 876 P.2d 1062, 1067 & n.7 (Cal. 1994) (citing *Commercial Standard* for the proposition that "courts have long recognized that the [equitable indemnity] is not available where it would operate against public policy"); *see also Yamaha Motor Corp. v. Paseman*, 268

Cal. Rptr. 514, 518 (Cal. Ct. app. 1990) (indemnity, "[q]uite simply, . . . is a matter of fairness"); *Considine*, 232 Cal. Rptr. at 255 ("[O]ur primary concern must be whether it is equitable to require the [indemnitor] to bear a portion of [the plaintiff's] losses."). In other words, "[t]he key ingredient in equitable indemnity is equity." *Seamen's*, 236 Cal. Rptr. 31, 36 (Cal. Ct. App. 1987). The Court finds that equity permits at least partial indemnity by the TPDs.

According to the Greenfield and Starlight TPDs, it would be inequitable to permit indemnity from the TPDs in this case because, whereas the TPPs were "actively negligent," the TPDs are "an otherwise innocent and passive third party." (ECF No. 45-1 at 14.) Assuming the facts in the third-party complaint are true, however, the TPDs were also actively negligent by withholding disclosure of dangerous contamination from their tenants. Such conduct is neither innocent nor passive. It also makes this case different from those in which California courts held that it would be inequitable to permit indemnification. In *Munoz*, for example, the court held that equity would not permit the attorney whose "subsequent negligence relieved the original tortfeasor of liability . . . to have that tortfeasor share the attorney's liability for malpractice" because to do so would essentially "repeal the statutes of limitation, make every tortfeasor the guarantor of his victim's adequate compensation as well as the malpractice insurer of his victim's attorney and undermine the fiduciary duty of the non-negligent attorney to his client."[3] 190 Cal. Rptr. at 407. Here, there is no reason to think that permitting partial indemnity from the TPDs would transform landlords into insurers of their neighbors. Only if—as is alleged here—a landlord *knows* that a neighbor has contaminated the landlord's property with dangerous chemicals is the landlord potentially liable for any harm to the residents that results from the landlord's failure to disclose that information. Assuming the truth of the

---

[3] The *Munoz* court also focused on the fact that it would be inequitable to permit a "subsequent tortfeasor to be indemnified by the initial tortfeasor." 190 Cal Rptr. at 406. That is not the case here, where the initial tortfeasor is seeking indemnity from a subsequent tortfeasor.

third-party complaints, the TPDs are to some extent at fault for Plaintiffs' injuries: if the TPDs had warned their residents about the contamination, the residents could have protected themselves by either choosing to live elsewhere or taking appropriate precautions to mitigate the harm. Holding the TPDs liable, to a certain extent, would not be unfair under these circumstances. *See also Herrero v. Atkinson*, 38 Cal. Rptr. 490, 493–94 (Cal. Ct. App. 1964) ("Although the original negligence of [the indemnitee] may be regarded in law as a proximate cause of the damages flowing from the subsequent [negligence] of the [indemnitor], and the plaintiff may recover a joint and several judgment against all who are found liable, there is no reason why the ultimate burden of damages should not be distributed among the various defendants, and each be made to bear that portion of the judgment which in equity and good conscience should be borne by him.").

To be sure, it would be unfair to permit the TPPs to obtain *full* indemnification from the TPDs because the TPPs' conduct—as alleged in Plaintiffs' complaint—was significantly more culpable than the TPDs'. [4] If it were not for the contamination created by the TPPs, the TPDs would not have been responsible for warning Plaintiffs of the

_____

[4] In a separate section of their memoranda, the Villa Cajon TPDs argue that the TPPs cannot state a cause of action for "contribution." (*See* ECF Nos. 31-1 at 12–13; 32-1 at 11–12.) This suggests that Villa Cajon views the TPPs' indemnity action as two separate claims: one for full indemnification, and one for partial indemnification, or "contribution." Under California law, however, equitable indemnification is the same cause of action regardless of whether the would-be indemnitee is seeking full indemnification or partial indemnification. *See, e.g.*, *Far West Fin. Corp. v. D&S Co.*, 760 P.2d 399, 406 (Cal. 1988) (en banc) ("[T]here are not two separate equitable indemnity doctrines in California, but a single "comparative indemnity" doctrine which permits partial indemnification on a comparative fault basis in appropriate cases. . . . [It would not] be improper, in a comparative indemnity action, for a trier of fact to determine that the facts and equities in a particular case support a complete shifting of a loss from one tortfeasor to another . . . . Even when such a total shift of loss may be appropriate, however, the indemnitee's equitable indemnity claim does not differ in its fundamental nature from other comparative equitable indemnity claims."); *Std. Pac. of San Diego v. A.A. Baxter Corp.*, 222 Cal. Rptr. 106, 112 (Cal. Ct. App. 1986) ("Comparative equitable indemnity includes the entire range of possible apportionments, from no right to any indemnity to a right of complete indemnity. Total indemnification is just one end of the spectrum of comparative equitable indemnification.").

3:17-cv-00597-GPC-AGS

hazard.  But to the extent that the TPDs did fail to disclose that information, equity permits the TPPs to seek some indemnification from the TPDs.

### iv.  Sufficiency of the Allegations in the Third-Party Complaint

The TPDs argue that the allegations in the third-party complaints are insufficient to state a plausible claim that the TPDs violated any duty owed to Plaintiffs, and as a result, fail to state a claim for equitable indemnity.  *See Gem Developers*, 261 Cal. Rptr. at 632 (indemnity may be sought "on any theory that was available to the plaintiff upon which the plaintiff would have been successful").  "It is the settled rule that . . . a landlord is under a duty to warn the tenant of any hidden danger or defect in the leased premises of which he has knowledge . . ." *Hanson v. Luft*, 374 P.2d 641, 682 (Cal. 1962).  Taking the allegations in the third-party complaint as true, the Court finds that it is plausible that the TPDs violated this duty.

According to the third-party complaints, as early as 1999, owners of the mobile home parks received notices from the San Diego Regional Water Quality Control Board. One of these notices indicated that the board was considering a request to designate the TPDs' facility as a Containment Zone, and attaching information about the toxins' "release and the actions taken thus far to abate the pollution conditions."  (ECF Nos. 12 at 9–10 ¶¶ 42, 43; 14 at 10 ¶¶ 43, 44.)  That specific notice indicated that the recipients of the notice owned "property within the affected area."  (ECF Nos. 12 at 9–10 ¶ 42; 14 at 10 ¶ 43.)  The Greenfield TPDs have managed their property since 1993; it is therefore plausible that they received this notice in 1999.  The complaints also allege that the Starlight TPDs' predecessor-in-interest in the property "communicated with the Regional Board representatives beginning in 1999, and several times thereafter, regarding the history of past discharges at the Facility, as well as the investigation of the underground plume and its impact beneath the Starlight Park," and later "granted permission for installation of a groundwater monitoring well" on the property to measure "the plume conditions."  (ECF Nos. 12 at 11 ¶¶ 48, 49; 14 at 11 ¶¶ 49, 50.)  It is plausible to infer that when the Starlight Park TPDs acquired the property, they would have been informed

of these events.  Finally, as to the Villa Cajon TPDs, the third-party complaints allege that they were "presented with documents during the pre-acquisition due diligence period which identified the Facility, and the matter of past discharges at the Facility, as well as the investigation of the underground plume, as well as the publicly-accessible records," such as "Phase I environmental assessments."  (ECF Nos. 12 at 11 ¶ 52; 15 at 11–12 ¶ 52.)  As with the other TPDs, this raises a plausible conclusion that the Villa Cajon TPDs were aware of the contamination on their property when they purchased it.

The Greenfield and Starlight TPDs do not appear to dispute the conclusions above; rather, they assert that even if they knew about contamination, they did not know that the contamination was *dangerous*.  It is clear, however, that by at least July 10, 2015, the TPDs were aware of the dangers of the contamination.  On that date, the TPDs filed suit against the TPPs for nuisance-related claims stemming from the contamination of the TPDs' properties.[5]  (*See* ECF No. 45-2.)  In that complaint, the TPDs indicate that the contents of the contamination could lead to "cancer, liver and kidney damage, respiratory impairment and central nervous system effects."  (*Id.* at 9; *see also id.* at 13–15.)  The complaint also alleges that the Department of Toxic Substance Control had determined that the "cancer risk" in parts of the contaminated area were above an established "acceptable range."  (*Id.* at 13.)  The complaint also states that the contaminated area includes the Greenfield, Starlight, and Villa Cajon properties.  (*Id.* at 17.)  It also concludes by stating that "a continuous release of toxic chemicals is occurring every

_____

[5] The parties have filed several requests for judicial notice, all of which ask the Court to take judicial notice of filings made in this Court or California Superior Court.  (*See* ECF Nos. 31-2; 32-2; 37-1; 38-1; 45-2; 46-2; 49-1; 50-1; 55-1; 56-1; 57-1; 58-1.)  To the extent that the parties ask the Court to take notice of the facts that these documents were filed and make certain assertions, the requests are GRANTED.  *Hammit v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 1004 (S.D. Cal. 2014) ("A court may take judicial notice of . . . filings in federal and state courts if they are relevant.").  The Court will not, however, consider these filings as evidence of truth of any assertion made therein.  *See Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1084 n.1 (S.D. Cal. 2016) ("While matters of public record are proper subjects of judicial notice, a court may take notice only of the existence and authenticity of an item, not the truth of its contents.").

day," which "passes westward underneath the [TPPs'] property and into and beneath the [TPDs'] properties." (*Id.* at 22.) Based on the TPDs' own allegations, it is certainly plausible that the TPDs knew by no later than July 2015—nearly two years before Plaintiffs in this case filed suit—that the contamination in the groundwater and soil of their property posed a dangerous risk to their residents' health. Moreover, in light of the Water Control Quality Board's notices, it is also plausible that the TPDs knew of the contamination's dangerousness much earlier than 2015.

Because the allegations and relevant noticeable filings suggest that the TPDs knew of a dangerous condition on their property and did not disclose this information to Plaintiffs prior to the Plaintiffs filing this suit, the third-party complaints state a plausible claim for equitable indemnity against the TPDs.[6]

### c. Declaratory Judgment Action

The Villa Cajon TPDs also ask the Court to dismiss the TPPs' declaratory judgment action because the TPPs "cannot state a claim for equitable indemnity" because the TPDs "are not joint tortfeasors," and because the TPPs "are seeking equitable

---

[6] In their reply briefs, the Greenfield and Starlight TPDs also argue that the TPPs are judicially estopped from asserting that the TPDs failed to warn Plaintiffs of the dangerous contamination because in their Answer to the TPDs' complaint in the *Greenfield* Suit and a related state court action, the TPPs stated that they either deny or lack the necessary knowledge or information to respond to allegations that the TPPs caused toxic contamination of the TPDs' properties. (ECF Nos. 57 at 6–8; 58 at 6–9.) The Court rejects this argument for two reasons. First, arguments first asserted in reply briefs are generally not considered. *Barrett v. Negrete*, No. 02-cv-2210-L-CAB, 2010 WL 2106235, at *6 (S.D. Cal. May 25, 2010) ("New arguments may not be raised for the first time in reply memorand[a]."). Second, it is clear from the third-party complaints that the TPPs pursue this indemnity action only to the extent that they are found liable to Plaintiffs. (*See, e.g.*, ECF No. 12 at 14 ¶ 63.) In other words, the TPPs deny liability to Plaintiffs, but otherwise assert that if they are found liable, the TPPs are entitled to at least some indemnity from the TPDs. The Greenfield and Starlight TPDs offer no authority suggesting judicial estoppel prevents a party in the TPDs' position from pursuing such a theory. This is not surprising, because it would not. "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). It is "restricted . . . to cases where the court relief on, or 'accepted' the party's previous inconsistent position." *Id.* at 783. Here, there is no indication that this Court—or any court for that matter—has relied on any of TPPs' assertions in a manner that produces an unfair result.

indemnity from the victims of their own torts." (ECF No. 31-1 at 13.) Because the Court has rejected those arguments, the motion to dismiss the declaratory judgment action is also DENIED.

### d. Attorneys' Fees

The Villa Cajon TPDs contend that the TPPs cannot obtain attorneys' fees from the TPDs as a result of their indemnification action because California law follows the "American Rule" that fees are not recoverable unless expressly permitted by statute or prior agreement. *See Cassim v. Allstate Ins. Co.*, 94 P.3d 513, 528 (Cal. 2004). The TPPs respond by arguing that, if successful against the TPDs, they will be entitled to fees under Cal. Civ. Proc. Code § 1021.6. That provision states:

> Upon motion, a court after reviewing the evidence in the principal case may award attorney's fees to a person who prevails on a claim for implied indemnity if the court finds (a) that the indemnitee through the tort of the indemnitor has been required to act in the protection of the indemnitee's interest by . . . defending an action by a third person and (b) if that indemnitor was properly notified of the demand to . . . provide the defense and did not avail itself of the opportunity to do so, and (c) that the trier of fact determined that the indemnitee was without fault in the principal case which is the basis for the action in indemnity or that the indemnitee had a final judgment entered in his or her favor granting summary judgment, a nonsuit, or a directed verdict.

*Id.*

The Court finds that the TPPs have no plausible claim for attorneys' fees under section 1021.6. The TPPs have not been forced "through the tort of" the TPDs to defend Plaintiffs' suit. As stated above, the TPP's alleged conduct is significantly more culpable than the TPDs'. Moreover, the only circumstances in which the TPPs would be entitled to indemnification from the TPDs would be if the TPPs are held liable to Plaintiffs as a result of their causing serious contamination of the soil and groundwater under Plaintiffs' residences. If that occurs, there is no plausible scenario in which the TPDs could be found to be, as is required by section 1021.6(c), "without fault."

3:17-cv-00597-GPC-AGS

Finally, under California law, a party claiming partial indemnity from a concurrent tortfeasor is ineligible for attorneys' fees under section 1021.6. *Watson v. Dep't of Transp.*, 80 Cal. Rptr. 2d 594, 597–99 (Cal. Ct. App. 1998) ("partial indemnity from other concurrent tortfeasors" cannot fall within "implied indemnity" for purposes of section 1021.6 "because subdivision (c) requires an absence of fault"). For the reasons discussed above, the TPPs may be entitled to, *at most*, partial indemnity from the TPDs. The TPPs therefore cannot obtain attorney's fees under section 1021.6 in this litigation.

Because section 1021.6 is the only legal basis for which the TPPs argue they might be entitled to attorneys' fees, the Court GRANTS the TPDs' motion to dismiss with respect to the TPPs' claim for attorneys' fees.

## V.     Conclusion

For the reasons explained above, the TPPs have standing to seek partial equitable indemnity from the TPDs and have stated a plausible claim for relief. The TPPs, however, have no legal basis to claim attorneys' fees from the TPDs. The Court therefore **GRANTS in part and DENIES in part** the motions to dismiss. The motions are denied in all respects except for the TPPs' claims for attorneys' fees.


**IT IS SO ORDERED.**


Dated: October 24, 2017

Hon. Gonzalo P. Curiel
United States District Judge

3:17-cv-00597-GPC-AGS